# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-2996 & 02-4000

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

FOWOBI GEORGE and OLA MUSTAPHA,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 589—**Rebecca R. Pallmeyer**, *Judge.*

———————

ARGUED FEBRUARY 26, 2004—DECIDED APRIL 14, 2004

———————

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Fowobi George and Ola Mustapha appeal convictions that were the result of criminal transactions committed between the spring and fall of 2000. All of the schemes had a common thread: they involved the use of counterfeit checks to obtain money or goods. George and Mustapha worked with various other co-conspirators in their endeavors; we will describe the schemes briefly.

In the first scheme, George worked as a middleman for Abiola Amin, helping him obtain a counterfeit check. Amin used the check to purchase computer chips from Neutron,

Inc. in June or July of 2000, worth about $95,000. Amin was arrested on July 25, 2000; Mustapha removed the computer chips from Amin's apartment before the police had a chance to find them. Mustapha and George then sold the chips over the course of the next few weeks and Mustapha used part of the proceeds to buy a 1998 Lincoln Navigator.

The second scheme was in operation between May and August 2000. George and Mustapha recruited third parties to deposit counterfeit checks that Mustapha supplied into their bank accounts. Once the checks were deposited, they were to withdraw the funds in cash and give them to Mustapha. In return for their help they would receive a portion of the funds. In all, Mustapha directly or indirectly recruited four people. George provided Mustapha with two of the counterfeit checks used in this scheme.

The third scheme was carried out between May and September 2000; George had another man, Jason Libson, create numerous counterfeit checks. George provided Libson with legitimate checks he had received from clients of his business as models for Libson to copy. In all, Libson made more than one hundred counterfeit checks for George.

On February 21, 2002, George was found guilty of nine counts of uttering and possessing counterfeited securities and two counts of bank fraud. He was sentenced to thirty months' imprisonment and was ordered to pay $106,000 in restitution. On February 21, 2002, Mustapha was found guilty of one count of uttering and possessing a counterfeited security, four counts of bank fraud, and one count of money laundering. He was sentenced to thirty-seven months' imprisonment and was ordered to pay $93,000 in restitution. Both men appeal their convictions on various grounds; we affirm the district court's convictions and sentencing.

## Discussion

### I. George

George argues that his Sixth Amendment rights were violated when the prosecutor intimidated Amin into pleading the Fifth Amendment instead of testifying as a witness for George and also challenges the prosecutor's refusal to grant Amin use immunity to facilitate his testimony.

### A. Intimidation of a Witness

At trial George wanted Amin to testify that he had lied to the grand jury about George's involvement in the fraud schemes; Amin had already told the FBI a similar story a month earlier. At court, Amin's attorney advised him that if he testified for George, "there is a strong chance that the government could move to revoke the plea agreement" he had entered into, and a "very real possibility . . . that he could be charged with perjury or false statement." (Tr. at 1961-62.) The court confirmed the attorney's concern that, by testifying, Amin would place himself in jeopardy. (Tr. at 1965.) The prosecutor also stated in Amin's presence, in court: "We count five possible issues for which . . . testimony offered now may concern Mr. Amin: Perjury, false statements, obstruction of justice, . . . the underlying charges and . . . the revocation or a re-sentencing based on conduct within the plea agreement." (Tr. at 1968).

George believes the prosecutor and court acted to intimidate Amin to prevent him from testifying. George's appeal raises conflicting issues; on the one hand, a defendant has a Sixth Amendment right to present witnesses for his defense. *Washington v. Texas*, 388 U.S. 14, 19 (1967). Such a right may be violated if governmental interference prevents a witness from testifying. *Webb v. Texas*, 409 U.S. 95, 98 (1972). However, the defendant's right is tempered by a witness's Fifth Amendment privilege not to provide incrimi-

nating testimony.[1] A witness may validly choose not to testify if her testimony would be incriminating, or if it would "furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). The issue then is whether the prosecutor's and court's warnings were appropriate to protect Amin's right to assert his Fifth Amendment privilege, or whether they were an intimidation tactic employed to interfere with George's right to call Amin as a witness.

We believe that the prosecutor's and court's actions were a necessary conveyance of information so as to allow Amin to make an educated decision regarding his Fifth Amendment rights. George refers us to a handful of cases decided over the last forty years by various courts finding a violation when a witness was threatened by a prosecutor, or other official, and as a result did not testify. *See, e.g.*, *Webb*, 409 U.S. at 97 (finding a violation when a trial judge singled out the sole defense witness, assumed he would lie on the stand and admonished him that if/when he testified falsely he would be prosecuted for perjury and would lose his chance for parole), *United States v. Smith*, 478 F.2d 976, 979 (D.C. Cir. 1973) (finding violation when an Assistant United States Attorney approached a witness outside of court and told him that if he testified he would be prosecuted as an accessory to murder), *United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982) (finding a violation when the prosecutor called the witness's attorney the day before the witness was to testify to "remind" him that the witness could be re-indicted on related charges). This case is easily distinguishable. In particular, we note that the discussions in question occurred in court, on the

---

[1] The Fifth Amendment provides, "no person shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V.

record. The warnings contained accurate information about the risks he faced by testifying and were initiated by Amin's own attorney. *United States v. Hooks*, 848 F.2d 785, 802 (7th Cir. 1988) (finding no intimidation when witnesses acted on their own attorney's advice not to testify). The court and prosecutor merely corroborated, in a straightforward and nonthreatening manner, the information given by Amin's attorney. Given the plainly incriminatory nature of the proposed testimony, it is evident that Amin's assertion of his Fifth Amendment privilege was well considered.

### B.  Witness Use Immunity

George argues that the prosecutor should have granted Amin use immunity to allow him to testify at trial. Use immunity is a device created by 18 U.S.C. §§ 6002, 6003 that allows a witness to testify and not have that testimony used against him or her in a criminal case. The prosecutor is not required to grant use immunity, but may do so when, "in his judgment . . . the testimony or information from such individual may be necessary to the public interest." 18 U.S.C. § 6003(b). The power to grant use immunity is delegated exclusively to the executive branch of the government; federal courts play only a ministerial role in ensuring the power is properly exercised. *United States v. Taylor*, 728 F.2d 930, 934 (7th Cir. 1984). We review a prosecutor's decision not to grant a witness use immunity for clear abuse of discretion. *United States v. Schweihs*, 971 F.2d 1302, 1315 (7th Cir. 1992).

In this case, the government declined to provide Amin use immunity because it wished to maintain its ability to collect evidence to use against him in the event he violated the terms of his plea agreement. This situation clearly falls under the purview of our decision in *United States v. Hooks*. There we held, "[i]t is well within the discretion of a prosecutor . . . to decline immunity to a witness who could

be charged for false statement and perjury." *Hooks*, 848 F.2d. at 802. And it is the prosecutor's "prerogative to decide not to seek immunity simply because the government would gain nothing and the immunity would hinder future actions." *Id.* Given Amin's involvement in the fraud schemes and his earlier conflicting statements, the prosecutor did not abuse his discretion in not granting use immunity to Amin.

## II. Mustapha

Mustapha raises numerous issues on appeal. We discuss each separately.

### A. Fingerprint Testimony

Mustapha's first argument is that the expert testimony of Kim DeCarla Smith, an FBI fingerprint examiner, should have been excluded. Mustapha argues that the district court erred when it relied on our recent holding in *United States v. Havvard*, 260 F.3d 597 (7th Cir. 2001) to admit the Smith's expert testimony. In *Havvard* we closely examined fingerprint analysis techniques in light of *Daubert* and Federal Rule of Evidence 702 and concluded that such analysis was admissible. *Id.* at 599 (listing the district court's reasons for allowing fingerprint evidence and affirming its decision). Federal Rule of Evidence 702 allows the use of expert testimony, "[i]f scientific . . . knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. It is the role of the trial judge to play a "gatekeeping" function to ensure evidence is relevant and reliable. *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The Supreme Court's holding in *Daubert* also outlines a number of factors that a trial court should consider in deciding whether expert testimony is reliable, specifically (1) whether the theory on which it is based can be tested, (2) whether the theory or technique has been subject to peer review, (3) the rate of error of the technique and the existence of standards to control the technique's operation, and (4) whether it is generally accepted. *Id.* at 593-95. This is a flexible test, its outcome varies with the circumstances of each case.

Mustapha urges us to reconsider our holding in *Havvard*. We decline to do so, but merely point out areas of analysis that answer his specific concerns. Mustapha's concerns are twofold: first, he does not believe that the fingerprint analysis technique is able to be effectively tested, and second, he argues that *Havvard* incorrectly applied the *Daubert* test by relying only on the "general acceptance" prong. Mustapha supports his arguments with the Eastern District of Pennsylvania's short-lived opinion in *United States v. Llera Plaza*, 179 F.Supp.2d 492 (E.D. Pa. 2002) ("*Llera Plaza I*") vacated by, *United States v. Llera Plaza*, 188 F.Supp.2d 549, 566 (E.D. Pa. 2002) ("*Llera Plaza II*"). These arguments are easily answered. In *Havvard* we considered that fingerprint analysis was generally accepted, had a low rate of error and could be objectively tested. *See Havvard*, 260 F.3d at 599. This was more than sufficient ground to find it admissible under the *Daubert* test, and did not rely solely on one prong as Mustapha asserts. Additionally, in vacating its first opinion, the Eastern District of Pennsylvania noted that FBI fingerprint analysis had methods to control the techniques operation that were not purely subjective. *Llera Plaza II*, 188 F.Supp.2d at 571. Of particular note, and in answer to Mustapha's complaint that fingerprint analysis cannot be objectively tested, the *Llera Plaza II* court noted that the FBI annually tests its

fingerprint examiners with sets of prints whose sources are known to the testers, but unknown to the test-takers. *Id.* at 555-57. Hence, while an actual print taken in the field cannot be objectively tested, we are satisfied that the method in general can be subjected to objective testing to determine its reliability in application. For these reasons, we feel comfortable that *Havvard* correctly decided the issue of fingerprint analysis admissibility.

As to Mustapha's second argument, that the prints in his case were unreliable because they were partial rather than complete prints, we review the district court's decision to admit the testimony for abuse of discretion. We find that the district court did not abuse its discretion. Having found fingerprint analysis to be reliable, the issue as to whether particular prints can be connected to a particular defendant goes to the weight and credibility of the evidence. These are issues best left to the finder of fact, not an appellate court. *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 506 (7th Cir. 2003). Further, the issue that Mustapha is concerned about—the probability that the partial prints might be mis-attributed to him—was thoroughly covered in the cross-examination of Smith. (Br. for Defendant-Appellant Ola Mustapha at 20.) Hence, the jury was functioning with a proper warning regarding the value of the fingerprint evidence. The district court did not abuse its discretion in allowing Smith to testify.

### B.  *Batson* Challenge

Mustapha also appeals the prosecutor's decision to strike an African-American juror, Mark Conner, from the venire panel. A prosecutor is forbidden to strike a juror from the panel solely based on the juror's race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). A prosecutor's motives in striking potential jurors is a question of fact. Because these are determinations of credibility, and because "the trial judge

is in the best position to evaluate the demeanor of the attorney exercising the challenge," we review such appeals for clear error on the part of the district court. *United States v. Jones*, 224 F.3d 621, 624 (7th Cir. 2000).

Not every strike of a racial minority from a jury venire is a violation of *Batson. Id.* There are three steps in handling *Batson* challenges. First, the appellant must make out a prima facie case that the strike was made on the basis of the juror's race; second, the party exercising the strike must offer a race-neutral reason for doing so; third, the trial court must decide whether the proffered reason is pretextual. *Tinner v. United Ins. Co. of Am.*, 308 F.3d 698, 703 (7th Cir. 2002). At all times during this analysis the burden of persuasion rests with the opponent of the strike. *Jones*, 224 F.3d at 624. Let us turn to the facts in this case with all this in mind.

During jury selection the prosecution struck one African-American juror and allowed one to sit on the jury. Mustapha raised his *Batson* challenge and the district court asked for the prosecution's reason for striking Conner. Prosecution stated two reasons for striking the juror, first, Conner had previously served on a jury that acquitted a defendant, and second, Conner stated that he had been pickpocketed once by a friend. The government's attorney believed these two factors made Conner more likely to sympathize with the defendant; the district court found these reasons were not pretextual.

We find the district court did not commit error. We note that, in showing it did not strike a juror due to his race, the government's proffered reason for the strike need not be particularly persuasive, or even based on quantifiable data, so long as it is not pretextual. *United States v. Jordan*, 223 F.3d 676, 687 (7th Cir. 2000). In this case the government could properly rely on Conner's statement that he had been pickpocketed by someone he knew as a reason to strike him.

The government explained that the case was about a criminal conspiracy where the participants were all either friends or acquaintances of one another; at times Mustapha was betrayed by other members of the conspiracy. The prosecution felt that the juror's experience may have caused him to sympathize with Mustapha. We find this a reasonable explanation.

## C.  Insufficient Evidence

Mustapha's third argument is that the prosecution did not present sufficient evidence to convict him on the charges of money laundering, bank fraud and uttering a counterfeit check. In considering whether there was sufficient evidence to find Mustapha guilty beyond a reasonable doubt, we view the evidence in the light most favorable to the government and will only reverse if no rational trier of fact could have found Mustapha guilty beyond a reasonable doubt for each element of the offense. *United States v. Sax*, 39 F.3d 1380, 1385 (7th Cir. 1994).

Mustapha was charged and convicted of money laundering in violation of 18 U.S.C. § 1957.[2] This charge was in connection with his sale of the computer chips in the first scheme, and subsequent use of the profits to make a down payment of $15,000 for the purchase of a 1998 Lincoln Navigator. In support of this charge, the government presented the testimony of five witnesses detailing Mustapha's actions with regard to the sale of the computer

---

[2]  18 U.S.C. § 1957 states in relevant part:

> (a) Whoever . . . knowingly engages . . . in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

chips, physical evidence in the form of boxes and trays in which the computer chips were shipped with Mustapha's fingerprints, and telephone records showing calls made by Mustapha and other conspirators. The documentation for the sale of the Navigator was also admitted into evidence; it showed on one side that Mustapha had paid $9,000, and on the reverse side it had notations signifying Mustapha had also paid $6,000. The government presented testimony to the effect that Mustapha knew he could not withdraw more than $10,000 from the bank at a time without triggering a currency transaction investigation (providing a logical explanation for the two-part transaction). A co-worker also testified that Mustapha told him he made a $15,000 down payment on the vehicle. Mustapha argues the witnesses were biased and not credible. We note that the credibility of witnesses is a function for the finder of fact. Viewing the evidence in the light most favorable to the government, it takes little imagination to see how a rational finder of fact could have found Mustapha guilty beyond a reasonable doubt of the money laundering charge.

Mustapha was also charged with and convicted of bank fraud, and uttering and possessing a counterfeit check in violation of 18 U.S.C. §§ 513(a)[3], and 1344.[4] These charges

---

[3]  18 U.S.C. § 513(a) states in relevant part:

> (a) Whoever makes, utters or possesses a counterfeited security of a State or a political subdivision thereof or of an organization . . . with intent to deceive another person, organization, or government shall be fined under this title or imprisoned for not more than ten years, or both.

[4]  18 U.S.C. § 1344 provides in relevant part:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice . . . to obtain any of the moneys, funds, credits, assets, securities, or other property owned by or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or
> (continued...)

were in connection with the second scheme, where Mustapha solicited individuals to deposit forged checks into their bank accounts and withdraw the proceeds for him. In support of these charges the government presented the testimony of the four individuals involved (who explained the details of the transactions), other conspirators in the scheme (Libson and Alawode), and telephone records of calls between Mustapha and George during the relevant time period. Again, Mustapha challenges the credibility of the witnesses. Again, we note that credibility is an issue reserved for the finder of fact; a rational finder of fact viewing this evidence in the light most favorable to the government could have found Mustapha guilty beyond a reasonable doubt.

### D.  Denial of Motion to Dismiss

Fourth, Mustapha argues that the district court erred when it declined his motion to dismiss Count 8, the money laundering charge. Mustapha believed the government failed to allege that his transaction regarding his purchase of the Lincoln Navigator involved at least $10,000. We review the district court's refusal to dismiss the indictment de novo. *United States v. Yoon*, 128 F.3d 515, 521 (7th Cir. 1997). We find that the indictment in this case, while brief, was sufficient in stating the charged offense. *See* Record at 86 (copy of the indictment).

### E.  Sentencing

Fifth, and last, Mustapha argues that the district court erred in determining his sentence for two reasons. First,

---

(...continued)
> promises . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Mustapha argues that the court erroneously found that he was a "manager or supervisor of a criminal activity that involved five or more participants," and accordingly erred in increasing his offense level by three levels. Second, he argues that the court should not have awarded him two criminal history points for having committed the offense while on probation. We review the district court's determination of these facts for clear error. *United States v. Gracia*, 272 F.3d 866, 876 (7th Cir. 2001) (considering sentencing increase under U.S.S.G. § 3B1.1), *United States v. Brown*, 209 F.3d 1020, 1023 (7th Cir. 2000) (considering criminal history points).

Section 3B1.1 of the federal Sentencing Guidelines is designed to increase the sentence of a defendant who exercises increased responsibility in a criminal organization. Specifically, the increase occurs when a defendant was a "manager" or "supervisor" of a criminal activity that involved five or more participants. It is not disputed that the conspiracy involved five or more members; rather, Mustapha argues that he was not a manager or supervisor. Application Note 4 to U.S.S.G. § 3B1.1 is instructive on making such determinations; it lists factors the court should consider, including: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." Additionally, under U.S.S.G. § 3B1.1, the role of "manager or supervisor" is distinguished from "organizer or leader," which is subject to harsher punishment.

Testimony at trial revealed that Mustapha acted as a recruiter for the bank fraud scheme, that he gave instructions to the third parties on how they should proceed, and that he provided the counterfeit checks. This was a sufficient basis for the upward adjustment.

In calculating his sentence, the district court awarded Mustapha two criminal history points for committing a portion of the crime on May18, 2000 while he was serving a 24-month probation sentence, pursuant to U.S.S.G. § 4A1.1(d). Mustapha disputes that his probation ended on June 29, 2000 (the date the order terminating the probation was entered)—he believes it ended on May 15, 2000 (the date the order terminating probation was signed). We note that the probation sentence began on June 30, 1998 and had a duration of 24 months; relying on basic arithmetic and a calendar, we find the district court did not commit clear error in finding the May 18, 2000 transaction was committed while Mustapha was under probation.

The convictions and sentences appealed from are AFFIRMED.

A true Copy:

     Teste:

                        _____
                        *Clerk of the United States Court of Appeals for the Seventh Circuit*