# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2134

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JASON WHITE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 03 CR 26—**Theresa L. Springmann**, *Judge.*

———————

ARGUED APRIL 12, 2005 —DECIDED JULY 28, 2005

———————

Before MANION, ROVNER, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* In April 2003, the Fort Wayne Police Department learned that Jason White was selling crack cocaine from a house at 118 W. Creighton Ave. in Fort Wayne, Indiana. They obtained and executed a search warrant, discovering rocks of crack cocaine, packages of crack cocaine, a razor blade, and a 9 millimeter handgun. A jury in the Northern District of Indiana convicted White of possession of cocaine base with intent to distribute, being a felon in possession of a firearm, and use of a firearm in

furtherance of drug trafficking crime. On appeal, White challenges the validity of the search warrant and the government's exclusion of a black juror. We affirm.

## I

On March 25, 2003, Detective Justin Henry arranged for a confidential informant ("CI") to make a controlled purchase of crack cocaine from Jason White at 118 W. Creighton Ave. (the "Creighton house"). Officers searched the CI before the transaction and gave the CI $50 of pre-recorded drug money. The CI entered the front door of the Creighton house while the officers conducted surveillance on the location. Approximately fifteen minutes later the CI exited the house and returned, having purchased crack cocaine. After being shown a photo array of six individuals, the CI identified the picture of Jason White as the person who sold the drugs. The police also confirmed that White had provided that address as his residence during a prior police investigation.

The next day, Detective Henry swore an affidavit as to the events of the night before. Henry described the Creighton house as a "two-story, wood-frame, single family residence which is light gray in color with black trim with an entry door that faces south with a detached garage." An Indiana state court judge granted a search warrant, ordering a search for evidence of drugs, firearms, and drug paraphernalia. In the search warrant, the state court judge described the house in the same manner as Henry.

On April 1, 2003, Henry called White to set up a purchase of $100 worth of crack cocaine. White gave Henry directions to the Creighton house and indicated that he would meet Henry in a Cadillac parked in an alley behind the house. When Henry arrived, he observed White sitting in the

Cadillac, as had been agreed. Members of the Fort Wayne Police Emergency Services Team then approached the car and took White into custody. No drugs were found on his person, though police recovered over $350 in cash.

At approximately the same time that White was taken into custody, the police executed the search warrant. According to Henry, he found on the first floor a "room [that] had been converted to a beauty salon, a barber shop." Also on this first floor was a "little living room" with a bedroom off to one side, a kitchen, and another room that leads to the back door. Henry further explained that on one side of the salon portion of the first floor "there's a stairwell that goes up and there's another little apartment up there [on the second level] with a separate kitchen and living room, and bedroom."

In the downstairs bedroom, the police searched a dresser which contained, in addition to some clothing, a handgun and a large quantity of crack cocaine. Police discovered "another chunk of crack cocaine" and a razor blade on a plate on top of the dresser in this bedroom. The parties stipulated at trial that the total weight of the crack cocaine recovered in the search was 13.53 grams. In the downstairs portion of the house, the police also found mail belonging to Jason White, though the mail contained a different address than that of the Creighton house. Finally, the police recovered a wallet from the downstairs bedroom that contained Jason White's driver's license and social security card.

A grand jury indicted White for: (1) knowing and intentional distribution of less than 5 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1); (2) knowing and intentional possession with intent to distribute more than 5 but less than 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B); (3) possession of firearm by a felon,

in violation of 18 U.S.C. § 922(g)(1); and (4) knowing possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Before trial, White made several motions in an attempt to suppress the evidence obtained during the search of the Creighton house. In particular, White made both a motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), and a motion to suppress the fruits of the search based on a lack of probable cause to support the search warrant. In his motion for a *Franks* hearing, White claimed that the police intentionally omitted material information from the search warrant affidavit that could have affected the probable cause determination. The latter motion specifically questioned the credibility and reliability of the CI in this case and alleged that the police failed to corroborate the CI's information. The district court denied both motions.

The case eventually proceeded to trial in January 2004, though the first count, which related to the distribution of the less than 5 grams of crack cocaine, was dismissed shortly before trial. During jury selection, the government used a peremptory challenge on the lone black juror because of her answer to one of the questions in the jury questionnaire. In response to the question, "Have you any preconceptions or attitudes about jury duty, the American legal system, the courts, its officers, and attorneys which you believe would affect your ability to serve as a jury?," the potential juror stated that "she was a very conservative person, and that she tended not to see things in great perceptions." The government explained that this answer suggested that the potential juror might not correctly apply the reasonable doubt standard, forcing the government to prove more than its proper burden. White, a black man, felt this was not a sufficiently race-neutral reason and objected based on *Batson v. Kentucky*, 476 U.S. 79 (1986). In response, the government

brought to the court's attention that "there were no other responses of that same nature with regard to any of the other people in the boxes." The court concluded that the potential juror had singled herself out and that White had not met his burden to show that the government's exercise of the challenge was improper. Therefore, the peremptory challenge was permitted.

After a two-day trial, the jury convicted White on the three remaining counts of the indictment. At sentencing, the district court imposed a sentence of: (1) 150 months' imprisonment on the distribution count; (2) 120 months' imprisonment on the felon in possession count, to be served concurrently with the distribution sentence; and (3) 60 months' imprisonment on the possession of a firearm in a drug trafficking crime, to be served consecutively to the other counts. White appeals his conviction but does not challenge his sentence.

## II

White presents two separate arguments. First, he claims that the search warrant was defective because it failed to describe the Creighton house with particularity, and, therefore, the fruits of the search should have been suppressed. Second, White asserts that the district court erred in overruling his *Batson* challenge to the government's exclusion of the sole potential black juror. We examine each in turn.

## A

White initially claims that the district court erred in admitting the evidence found at the Creighton house as the search warrant was insufficiently particular. This court normally reviews the denial of a motion to suppress for

clear error. *See United States v. Butler*, 71 F.3d 243, 248 (7th Cir. 1995). However, in the district court, White never challenged the warrant's particularity in either his motion to suppress or his motion for a *Franks* hearing. Rather, White argued that the warrant was not supported by probable cause. Since White failed to raise this argument before the district court, we review for plain error. *See United States v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003). To establish plain error, White must show an error that was plain, which affected his substantial rights and seriously affected the fairness, integrity, and public reputation of the judicial proceedings. *See id.*

The Fourth Amendment establishes that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched . . . ." U.S. CONST. amend. IV. As a general matter, "[t]he basic requirement is that the officers who are commanded to search be able from the 'particular' description of the search warrant to identify the specific place for which there is probable cause to believe that a crime is being committed." *United States v. Hinton*, 219 F.2d 324, 326 (7th Cir. 1955). If a warrant fails to describe with particularity the place to be searched, it is void. *See Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000). When a search involves a building with multiple, separate units, the warrant must specify the precise unit that is the subject of the search to satisfy the particularity requirement. *See id.* at 767; *see also Hinton*, 219 F.2d at 326 (finding warrant invalid for failure to specify unit to be searched in multi-unit building).

The Supreme Court has recognized, however, that the validity of a warrant must be judged on the basis of the information available at the time that the warrant issued. *See Maryland v. Garrison*, 480 U.S. 79, 85 (1987) ("the discovery of facts demonstrating that a valid warrant was unnecessar-

ily broad does not retroactively invalidate the warrant"). In *Garrison*, the police obtained a warrant for a floor of a three-level residential building, under the mistaken belief that the floor designated in the warrant contained only one apartment—that of a suspect named McWebb. *See id.* at 81. The police relied on an informant, an exterior examination of the building, and an inquiry of a utility company when making this determination. *See id.* As it turned out, there were two apartments, one of which belonged to Garrison and which contained drugs that the police discovered during their search. *See id.* Analyzing the validity of the warrant, the Supreme Court stated that if the officers knew or should have known that there were two separate dwellings on the third floor, the warrant would not authorize the search of the whole floor (as it would not be particularized). *See id.* at 85. However, the Supreme Court found that the police investigation had produced a reasonable belief that there was only one tenant. *See id.* at 86, n.10. The Supreme Court thus concluded that the warrant was valid based on the information that the officers disclosed and had a duty to disclose to the magistrate. *See id.* at 86.

In order to succeed under *Garrison*, White needs to first establish that the warrant failed to describe the Creighton house with particularity. If he succeeds in showing that, he must then show that the police knew or should have known, based on the available information at the time the warrant issued, that the warrant was overbroad. Again, any plain error regarding the warrant's particularity must be clear or obvious, as well as prejudicial, for it to be cognizable. *See United States v. Olano*, 507 U.S. 725, 734 (1993).

We first consider White's assertion that the warrant did not comply with the particularity requirement because the Creighton house is not a single family residence as described in the warrant, but actually a multi-unit, multi-pur-

pose building. When the police entered the Creighton house, they found one room that had been converted into a barbershop, with the remaining parts of the building still in residential use. Each of the two floors contained a furnished bedroom, living room, and kitchen. White claims that the Creighton house was comprised of two distinct apartments and the barbershop, which would invalidate the warrant as its description merely stated that the Creighton house was a single family residence.

White fails to show plain error regarding the particularity of the description in the warrant. Even if it turned out that the residence did contain multiple units, the warrant still would be proper under *Garrison*. As discussed earlier, *Garrison* examines the validity of a warrant based on what the police knew or should have known, and accordingly, what they disclosed or had the duty to disclose to the magistrate at the time of the warrant's issue. *See* 480 U.S. at 85. While White does not claim that the police actually knew that there were multiple units in the Creighton house, he asserts that the police should have known of these units nonetheless. But other than what the CI might have told them, they had no way of knowing.

As in *Garrison*, the police here conducted an investigation that suggested that the drug house was a single family residence. First, the police officers made an exterior examination and surveillance of the Creighton house while the CI made the original purchase of crack cocaine from White. Based on the purely exterior view, the Creighton house did not appear to have multiple units and looked like a normal residential house. Second, the CI told the police that White, who would sell him drugs, lived at the Creighton house, which further suggested that it was merely a residence. Third, White had previously given the Creighton address to the police as his residence. While several years had elapsed,

this earlier description by White of this address as his home would offer confirmation that it was simply a residence. Finally, and significantly, Detective Henry had a clear view of the front entrance of the Creighton house as he observed the CI approach and enter the house. A few minutes after the CI entered the house, he returned with the crack and described the transaction to Henry. He entered the house, told White he wanted $50.00 worth of crack, White said no problem, and gave him the crack in exchange for $50.00. Nothing in Henry's affidavit refers to the CI describing something unusual about the interior of the house. He entered, met with White, made the purchase, and left.

As White himself candidly admitted before the court, the distinctions between the different areas of the Creighton house are "fluid." This is not a storefront barbershop with clearly marked apartments next to or above the store. Rather, this is a house that does not have the typical distinctions that designate separate apartments.[1] The living areas on both floors are not separate from each other. There is no indication that a person who lives downstairs could not go upstairs or vice versa. There do not appear to be any internal locks separating the allegedly distinct parts of the Creighton house from each other. Even White's exculpatory witness, his brother Willie White, lent credence at trial to the notion that this was a single family residence, testifying that only he (Willie) had the keys to the house and lived up-

---

[1] Henry did refer to the second floor as a "little apartment" in his trial testimony. Nonetheless we need to look to the entire layout of the house to determine if there were multiple units because Henry provided no further explanation for his passing comment and because the status of the second floor was not an issue that the parties explored in detail at trial. The initial purchase and the location of the drugs was on the first floor.

stairs. This was the Whites' house, not a collection of separate, independent apartments.

The one unusual feature in this house that adds some complexity to the analysis is the room that had been converted into a barbershop. As the rest of the house seems to be a residence, the particularity of the warrant's description hinges on whether the barbershop room constitutes a separate and distinct unit in the house. That would make it obvious that the location was a business, not a house. The record contains no description of the barbershop room that we could use to conclude that this room constituted a distinct area limited to that business and, thus, call into question the warrant's description. Given the lack of information in the record describing this room, we cannot say that a description of the Creighton house as a single family residence, rather than a house and a business, was a plain or obvious error.

White argues that the police should have deduced that the Creighton house was actually composed of distinct units based on a sign with the barbershop's name in the front window. However, the record does not provide any details about this sign, such as the text or the size of the sign, or whether it was permanently attached to the window or removable. These considerations are important because without these details we cannot conclude that the officers should have noticed the sign and that the house contained a separate business.

Viewed in full, even if the house did contain multiple units, the warrant was sufficient at the time of issue. As in *Garrison*, the police conducted a reasonable investigation, which did not suggest that the Creighton house actually contained more than one unit. The police confirmed their evaluation of the exterior through White's previous statement and the CI. And when the CI entered, he encountered

White who obviously had control of the house as he executed the drug sale. Based on the information that the police knew or should have known, the warrant was valid when it issued. There was no error, plain or otherwise.[2]

## B

White also challenges the district court's denial of his *Batson* objection to the government's use of one of its peremptory challenges. A prosecutor is forbidden from striking a juror solely because of his race. *See Batson*, 476 U.S. at 89. "The court 'will only overturn the trial court's determination that a prosecutor's use of peremptory challenges was not motivated by purposeful discrimination if that determination is clearly erroneous.' " *United States v. Jones*, 224 F.3d 621, 624 (7th Cir. 2000) (quoting *United States v. Williams*, 934 F.2d 847, 849 (7th Cir. 1991)). We must have a firm and definite conviction that a mistake was made before reversing a trial court's *Batson* ruling. *See Jones*, 224 F.3d at 624.

When evaluating the validity of the prosecution's use of a peremptory challenge, we proceed with a three-stage analysis. *See, e.g., United States v. Jordan*, 223 F.3d 676, 686 (7th Cir. 2000); *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 703 (7th Cir. 2002). First, the defendant must establish a prima facie case that the challenge was being used to exclude a prospective juror because of his race. *See Jones*, 224

---

[2] White also makes a short argument in his initial brief that the police violated the Oath or Affirmation clause of the Fourth Amendment by failing to disclose information about the alleged multiple-unit character of the Creighton house to the judge who issued the search warrant. As we do not find that the police knew or should have known of any multiple-unit character of the Creighton house, this argument fails as well.

F.3d at 624. Second, the government must offer a race-neutral reason for striking the juror. *See Jordan*, 223 F.3d at 686. This explanation does not need to be particularly persuasive, it just cannot be a lie covering up a race-based motive. *See United States v. George*, 363 F.3d 666, 674 (7th Cir. 2004). Of course, the weaker the reason, the more likely it actually is pretext. *See United States v. Roberts*, 163 F.3d 998, 999 (7th Cir. 1998). Turning to the third step in the *Batson* analysis, the trial court must decide whether the prosecution's explanation was pretextual and whether the defendant has proven purposeful discrimination. *See Jordan*, 223 F.3d at 686. The ultimate burden of persuasion remains with the opponent of the strike throughout. *See George*, 363 F.3d at 673.

In this case, the government moved to strike a black juror based on her response to the question, "Have you any preconceptions or attitudes about jury duty, the American legal system, the courts, its officers, and attorneys which you believe would affect your ability to serve as a jury?" The potential juror, who was the only member of the jury pool to respond with more than a simple "no" to that question, stated that "she was a very conservative person, and that she tended not to see things in great perceptions." Proceeding to the first stage of the *Batson* analysis, White normally would have to make a prima facie case that the challenge was being used because of the juror's race. In this case, however, as "the government volunteer[ed] a race neutral explanation for exercising peremptory challenges and the trial court [went] on to rule on the ultimate issue of whether the race neutral reason was really a pretext for discrimination, the issue of whether the challenging party has established a prima facie case is moot." *See Jones*, 224 F.3d at 624 (citing *United States v. Cooper*, 19 F.3d 1154, 1160 (7th Cir. 1994)).

The government, therefore, had to produce some non-discriminatory reason for its action, which it did. At the time he challenged the juror, the government attorney stated that he wanted to strike this juror because he was concerned that her answer might indicate the juror would be difficult to persuade on the issue of reasonable doubt. The government attorney further mentioned that this potential juror was the only juror who answered in this way to the question. Confronted with this explanation, the trial court found no *Batson* violation.

Before us, White claims that the government's reason must be pretext because the juror stated that she was conservative, an attribute White assumed the government should have found attractive. White also asserts that the juror's answer did not directly implicate her ability to apply the reasonable doubt standard. However, "[o]nce the trial judge has been persuaded of the neutrality of the prosecutor's reason for striking a juror, we have no basis for reversal on appeal unless the reason given is completely outlandish or there is other evidence which demonstrated its falsity." *Jones*, 224 F.3d at 625. White must establish more than a disagreement with the government's rationale. He must demonstrate that the prosecution's reason was outlandish or that other evidence showed it to be a lie. While the juror never referenced reasonable doubt in her answer, it is understandable that the government might have been concerned whether a juror who "did not see things in great perceptions" would be able to apply this standard. As the government indicated, this juror singled herself out with a cryptic answer that called into question her ability to fulfill her obligations as a juror. It was not outlandish for the government to be anxious about someone who volunteers that her attitudes and preconceptions might affect her performance in the jury room. Nor was it unreasonable for the

district court to find that the government's decision to strike such a juror was not pretextual or otherwise improper. White fails to meet his burden to show that a discriminatory motive lay beneath the government's plausible reason for the strike.

### III

Based on the foregoing reasons, we AFFIRM the conviction of Jason White.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*