In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-2007 & 05-2008

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

STYLES TAYLOR AND KEON THOMAS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:01-cr-00073-CRN—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED MARCH 26, 2007—DECIDED DECEMBER 7, 2007

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Styles Taylor and Keon Thomas, both African-American, were jointly tried for the armed robbery of a gun store and the murder of its elderly owner, who was Caucasian. The government sought the death penalty for both men, but ultimately they were sentenced to life imprisonment after the jury found them guilty. Taylor and Thomas contend that their convictions are tainted by the government's use of peremptory challenges to strike African Americans from the jury pool, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Additionally, Taylor alone argues that his rights under the Confrontation Clause were violated at trial. For the reasons

set forth in the following opinion, we conclude that the district court did not commit clear error in resolving the bulk of the defendants' challenges under *Batson*. However, we are unable to draw this conclusion with respect to potential juror Heshla Watson because the district court did not put factual findings on the record regarding the credibility of the government's reason for striking her. For that reason we will remand to the district court for supplemental factfinding on this point. Finally, we reject Taylor's Confrontation Clause argument because it does not implicate the improper admission of testimonial evidence.

## I.

In April 2001 a grand jury returned a seven-count indictment against Taylor and Keon Thomas, as well as Damione Thomas and Adam Williams, Jr. As relevant here, Taylor and Keon Thomas ("the defendants") were charged with conspiracy to commit robbery and murder, 18 U.S.C. § 1951, robbery in violation of the Hobbs Act, *id.*, and murder committed during the course of a robbery, *id.* § 924(c) & (j). Damione Thomas and Williams pleaded guilty to various charges; Taylor and Keon Thomas pleaded not guilty and proceeded to trial. On November 19, 2003, Judge Sharp, who was then presiding, denied the defendants' motion for severed trials, but granted severance for the penalty phases.

Jury selection for the joint trial began before Judge Sharp on July 6, 2004. Beforehand the entire jury pool had filled out a lengthy questionnaire that included questions probing the potential jurors' views on the death penalty. Question 133 would become a major part of the parties' selection decisions. The question asked each potential juror to circle the letter corresponding to the statement that best expressed his or her view on the

death penalty. The responses ranged from "A," the most anti-death penalty stance, to "I," which represented the view that the juror would always vote for the death penalty where requested. Generally, "E" represented the most neutral stance, with A through D representing varying degrees of opposition to the death penalty and F through I including a range of pro-death penalty views.

Under the district judge's rules, all the voir dire was conducted by the court, and the parties could exercise peremptory challenges only at the end of each day. The voir dire consisted first of questioning the potential jurors as a group, and then following up with each individual potential juror, in particular about his or her views on the death penalty. The government, which sought the death penalty for both defendants despite forensic evidence that only one had committed the murder, requested that Judge Sharp ask each potential juror whether he or she would consider imposing the death penalty on a "non-shooter."[1] Judge Sharp refused to ask the question because he did not "want to wade into who is the triggerman and who is not a triggerman." That first day, three jurors were empaneled. The following day, Judge Sharp recused himself due to illness. Eventually the case was reassigned to Judge Norgle.

Jury selection resumed on July 29, 2004, before Judge Norgle, who imposed a different set of procedures. Judge Norgle began with a group voir dire and then individually

---

[1] Both fatal shots apparently were fired from the same gun by the same defendant. In support of its proffered question, the government cited an Eighth Circuit decision in which the court held that it was not error to exclude for cause a potential juror who stated that she could not impose a death sentence on a defendant who was not the shooter. *See United States v. Moore*, 149 F.3d 773, 780 (8th Cir. 1998).

examined each potential juror, but he also allowed the parties to follow up with their own questions. Additionally, Judge Norgle decided that challenges should be raised as they arose, rather than at the end of the day. Over the defendants' objection, the government was permitted to ask potential jurors whether they could impose the death penalty on a non-shooter. It posed the question to most, but not all, potential jurors, and the parties followed up to varying degrees on this point.

As jury selection progressed, the government used peremptory challenges to exclude seven African Americans—five from the pool of regular jurors and two potential alternates. All told, of the 94 potential jurors interviewed by the court, 16 were African-American. Three were dismissed at the outset due to family or health concerns, seven were dismissed for cause, and five were dismissed upon the government's peremptory challenges. That left one African American on the jury. Five of the 21 potential alternates questioned by the court were African-American; of these, two were dismissed on the government's peremptory challenges, and three were seated as alternates.

The first peremptory strike of an African-American potential juror met with no objection. The government soon exercised a peremptory strike against another African American, Heshla Watson, and the defendants did not object immediately. However, the defendants raised a *Batson* objection after a third African-American potential juror, Jamie Golliday, was dismissed based on the government's peremptory challenge. That challenge applied to the dismissals of both Watson and Golliday. From that point on, the defense raised a *Batson* objection every time the government exercised a peremptory challenge against an African-American member of the venire. In each case, Judge Norgle found that a prima facie case had been established and required the government to

supply a race-neutral explanation for the strike. In all but one case, the district court concluded that the government's reasons were not pretext for racially motivated strikes. The district court apparently overlooked this last step with respect to one potential juror.

After the five-week guilt phase of the trial, the jury found both defendants guilty on all counts. Taylor's sentencing phase came first, after which the jury recommended a sentence of life imprisonment. The government then withdrew its notice of intent to seek the death penalty as to defendant Thomas. The district court imposed sentences of life imprisonment on both defendants.

## II.

We begin with the defendants' joint argument that the government engaged in unlawful discrimination during jury selection. In *Batson v. Kentucky*, the Supreme Court reaffirmed that the government violates the Equal Protection Clause when it exercises peremptory challenges based on race. 476 U.S. at 93. To resolve claims about the discriminatory use of peremptory challenges, the Court set out a three-part process requiring: (1) that the defendant make a prima facie case of discrimination; (2) that the government provide a race-neutral explanation for its peremptory challenges; and (3) that the trial court decide whether the defendant established that the government's stated reason is pretext for racial discrimination. *Id.* at 94-98; *United States v. McMahon*, 495 F.3d 410, 420 (7th Cir. 2007).

Only the third part of the inquiry is at issue in this case, and it involves a credibility determination by the district court to which we owe substantial deference. *Batson*, 476 U.S. at 98 n.21. We will reverse only in the case of clear error; that is, if we are left with the firm and

definite conviction that a mistake was made. *United States v. White*, 416 F.3d 634, 640 (7th Cir. 2005); *United States v. George*, 363 F.3d 666, 673 (7th Cir. 2004). We decline the defendants' invitation to apply de novo review because of what it characterizes as the district court's misapprehension of the *Batson* procedure. After reviewing the transcripts, we are convinced that the defendant's claims of legal error are overstated. More importantly, the level of scrutiny the defendants seek is inherent in the clear-error standard. *See Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006) ("[W]hile factual findings are usually reviewed for clear error, findings which are bound up with the application of an inapposite legal standard are subject to closer review"); *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003) (same). In *Koon v. United States*, 518 U.S. 81 (1996), when addressing another deferential standard of review, abuse of discretion, the Court held that a "unitary" standard applies even to legal issues because the abuse-of-discretion standard "includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* at 100. Likewise, any misapprehension of the law in this case would simply inform our analysis of whether the district court clearly erred.

We turn now to the defendants' particular *Batson* arguments, and we will recount the additional relevant facts as they enter our analysis. The defendants first contend that two African American potential jurors were struck by the government for reasons that it did not find disqualifying with respect to Caucasian venire persons. Indeed, one way for a defendant to establish that the government's stated reasons for a peremptory challenge are pretextual is to compare the African Americans who were struck to Caucasians who were empaneled. *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)

("*Miller-El II*"). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.*

The defendants first compare potential juror Watson, an African American, to Caucasian jurors Wills, Evans and Nowak.[2] When called upon to provide a race-neutral explanation for excluding Watson (whom the government had unsuccessfully challenged for cause), the government cited her statement that she would not consider imposing the death penalty on a non-shooter. When asked by the government whether she could consider doing so, Watson in fact had replied, "No." The government did not follow up, but after questioning by the defense, Watson stated that she would want to hear evidence about the level of the suspect's participation and planning, and that she would "follow the Court's instructions on that question and consider[ ] that information before [determining] whether or not the death penalty would be imposed."

The defendants point to three Caucasian jurors who expressed similar reservations about executing a non-shooter but were not challenged by the government. We find their argument persuasive, particularly the comparison between Watson and Nowak. Both unequivocally answered "no" when first asked if they could impose the death penalty on a non-shooter. The government, in contrast to its practice with most other potential jurors, did not follow up with either of these potential jurors

---

[2]  The defendants also cited juror Brand as a comparator, but the government has asserted, and the defendants now appear to agree, that juror Brand is in fact an African American who was selected as an alternate juror.

for a more detailed explanation of the "no" answer. The defense, however, elicited responses from both Watson and Nowak revealing a willingness to consider the non-shooter's level of participation and follow the law.

We can discern no material difference between Watson and Nowak with respect to their views on the non-shooter issue—the *sole* reason the government supplied for its use of a peremptory strike against Watson. The government now distinguishes Nowak by asserting that she had difficulty hearing; although this is true, the transcript confirms that she heard the non-shooter question.[3] Because the answer that was disqualifying for Watson was not also disqualifying for Nowak, we are inclined to view with skepticism the government's rationale for exercising a peremptory challenge against Watson. Comparing Watson to Wills and Evans compounds that skepticism. Wills in particular expressed views akin to Watson's: general but not forceful opposition to the death penalty (expressed on the questionnaire and during voir dire) and initial resistance to the idea of executing a non-shooter later tempered in responses to follow-up questions. Yet the government challenged only Watson.

Despite these troubling comparisons, we are not unmindful of the standard of review; it is the district court's job,

---

[3] When prosecutor Philip Benson began his questions, Nowak stated that she was having trouble hearing him, and he began using a microphone. Throughout voir dire Nowak did not hesitate to ask to have questions repeated when needed, yet when Benson asked if she would consider imposing the death penalty on a non-shooter, she answered a clear "No." Benson then asked, "Under no circumstances?" Nowak replied, "I don't . . . I don't think so." Prosecutor David Vandercoy was the next questioner. He asked if Nowak had heard "all Mr. Benson's questions," and she replied, "Yeah." Thus there is no evidence that Nowak did not hear the non-shooter question.

not ours, to weigh the credibility of the government's reason for the peremptory challenge and decide whether the defendants met their burden of establishing discrimination. And upon close examination we find ourselves with a record that is silent as to the district court's rationale for denying defendants' *Batson* challenge with respect to Watson. As we have stated, the defendants simultaneously raised *Batson* challenges to "two peremptory challenges in a row" after the government excluded Watson and Jamie Golliday in quick succession. The district court ruled that a prima facie case was established, and the government offered race-neutral reasons for excluding both Watson and Golliday: Watson had answered "no" to the non-shooter question and Golliday had stated that she would "go for life" instead of imposing the death penalty. In ruling on whether pretext had been established, however, the district court addressed only Golliday, stating that the government's reason, "that the prospective juror would always use the term choice always for life," was not "a cover-up for racial discrimination or . . . subterfuge." Nothing in this ruling can be read to apply to Watson. Without the court's explanation for upholding the strike (we say this because the peremptory strike stood despite the lack of a clear ruling), we have nothing to review. The third step of *Batson* is a credibility determination—a question of fact. *See George*, 363 F.3d at 673. Only the district judge, who observed the voir dire firsthand, can make that determination in the first instance.

Accordingly, even though the defendants have made a strong case that the government removed Watson for discriminatory reasons, we must find out what the district court perceived before we can decide that issue. In this case, unlike many others, all the necessary information was put before the district court at the time, and there is no need for a further *Batson* hearing. We simply

need to learn the district court's assessment of the challenge in light the record made during voir dire. Therefore, we will retain jurisdiction over this case but remand to the district court for the limited purpose of supplementing the record with its findings about whether the government's stated reason for exercising a peremptory challenge against Watson is credible, or whether the defendants met their burden of demonstrating discrimination.

Moving on, the defendants next contend that the government excluded potential juror Golliday for reasons that it did not find prohibitive for white jurors Duggins, Stachura, Kasch, and Blaszak. When the district court asked the government for a race-neutral explanation for excluding Golliday, the prosecutor stated: "[H]er views indicate that death would be a problem, can't be sure if she could follow the law, think I could go—think I would go for life when presented with the choice between life and death, and then later on she answered, 'would go for life.'" Despite the defendants' protestations that other jurors with reservations about the gravity of their sentencing decision had been seated, the district court determined that "there is not enough to support an argument that [the challenge] is race-based."

The defendants cite a number of white jurors who expressed reservations comparable to Golliday's. During voir dire, Golliday stated, "when it comes to making [the decision to impose the death penalty], I think it would be a problem for me." She also stated that, although she "would like" to say that her opinion about the death penalty would not impair her performance as a juror, she "really can't be sure about that." When asked if her views would allow her to impose a sentence of life imprisonment or the death penalty, Golliday said, "I think I would live with life better than I could the death part," and "If there were some other sentence, I [sic] probably go

with the other than the death penalty." Golliday also stated that she had an open mind, that she would try her best to follow the law, and that she would make her decisions based on the evidence. On her questionnaire, Golliday had circled "C" when asked to select the statement that best expressed her view on the death penalty. Answer "C" states: "I am philosophically, morally, or religiously opposed to the death penalty. Nonetheless I believe that I can vote to impose the death penalty if it is called for by the facts and the law in the case."

For comparison the defendants first point to juror Duggins, who stated in regard to the death penalty: "I would have to see the evidence, but it would be an awful tough thing." She said it would be "easier" to impose a sentence of life in prison without parole. However, she also stated that her opinion on the death penalty would not impair her ability to follow the court's instructions and her oath as a juror. Because Duggins was interviewed by Judge Sharp, the parties had no opportunity to delve further into her views. The defendants next point to juror Kasch, who stated that she believed in the death penalty in principle but she didn't "like to be responsible for being the one imposing it." She discussed misgivings based on what she had heard about Illinois death sentences "they had to undo." Kasch opined that her views on the death penalty would not impair her performance as a juror and that it was her duty to follow the law. She, too, suggested that it would be easier to impose a life sentence, saying "I would think you might consider that you'd go on the side of caution and maybe not go with the death penalty." Finally, the defendants compare Golliday with juror Blaszak, who also expressed misgivings about death sentences that had been overturned in Illinois. Blaszak swore that her opinions on the death penalty would not prevent her from imposing either the death penalty or life imprison-

ment. She also stated, however, that during the guilt phase of trial it would be difficult to "block out" the fact that "the end result could be if someone was found guilty that the death penalty was a potential end result." In order to try to focus only on the guilt phase, she "would hope that in the sentencing phase, maybe the death penalty wouldn't be [her] only option." However, she had no "moral or religious reservations" about imposing a death sentence. Finally, the defendants cite alternate juror Stachura, who stated that he would have "more of a problem signing a death sentence" than imposing a sentence of life imprisonment. Stachura had described his view of the death penalty as "neutral."

The defendants contend that there is no material difference between Golliday and these white venire-persons who were seated as jurors or alternates, and the degree of similarity suggests purposeful discrimination as the real reason underlying the exclusion of Golliday. But the defendants' side-by-side comparisons do not convince us that the government excluded Golliday for a reason other than her inclination to "go for life" if given the choice. First, although most of the jurors the defendants cite expressed reservations about the difficulty of being responsible for choosing between life and death, Golliday alone questioned her own ability to be fair and stated that she would pick the life sentence if given the choice. The next strongest answer was Katsch's, but even she stated only that she would "consider" erring on the side of caution. Second, only Golliday expressed opposition to the death penalty on her juror questionnaire; she selected "C" whereas Duggins, Blaszak, and Stachura picked "E" and Kasch circled "J." Response "E" reflects a neutral stance on the death penalty, and "J" is simply "None of the above." These distinctions are minor but not trivial, and we cannot say that it was clear error to accept the government's stated reason for excluding Golliday.

The defendants next argue the government struck potential juror Washington, an African American, for discriminatory reasons, as evidenced by his exclusion based on what they characterize as one anomalous answer. According to the government at the time it was asked for a reason for its peremptory challenge, Washington was not suitable because he answered "yes" to the question of whether his views on the death penalty would prevent him from imposing a death sentence regardless of the law. The defendants contend, however, that this answer was so out of line with Washington's other statements about the death penalty that the government's reliance on it must be pretext for discrimination. The defendants point to Washington's questionnaire, where he indicated that "it is important that we have the death penalty as punishment" and that his *support* of the death penalty would make it difficult to be fair and impartial during the guilt phase. Washington did not answer the question asking him to circle the statement that best expressed his views on the death penalty; instead he wrote, "The death penalty has been here for years. If you try to live right and work hard in life there [sic] no need for crime. Most of all pray. Do the right thing. Count on God."

During voir dire, Washington elaborated on his views. He began by responding that he had no opinion on the death penalty other than that it was "the truth," and that it was for the jurors to decide. When asked to further explain his views, he spoke at length about his parents and his strict upbringing but did not address the death penalty. When questioned about how religious beliefs influenced his views, he stated, "I feel that everybody should pay for what they do." He said he would still be able to weigh all the appropriate factors and consider imposing the death penalty on a non-shooter. He said "I wouldn't want to be the one to take somebody's life,"

but added that he would be able to fairly consider the evidence and return whatever decision was appropriate under the facts and the court's instructions.

The defendants insist that Washington's support for the death penalty is evident and that his one statement that his views might prevent him from imposing it was an anomaly, but the government maintains that "one cannot possibly determine Washington's views on the death penalty." We are inclined to agree that Washington's position is difficult to decipher based on his responses at voir dire, and his questionnaire is similarly unilluminating. Moreover, while the defendants portray the isolated answer as the government's sole reason for the challenge, the government also highlighted the overall ambiguity of Washington's answers. The government noted that it could not decipher which of Washington's expressed views was "right in his view as he sits here today," and further stated, "[T]he ambiguity in his answers gives the government the right to exercise its peremptory challenge." In fact, the government cited the ambiguity as the reason it had not challenged Washington for cause; it simply could not tell whether he held strong views that would prevent him from serving. We find this situation not unlike the *White* case, in which the challenged juror "singled herself out with a cryptic answer that called into question her ability to fulfill her obligations as a juror." 416 F.3d at 641. Likewise, Washington responded cryptically to questions that directly implicated his ability to be impartial, and it was not clear error for the district court to accept the government's explanations for the strike.

The defendants next argue that the government gave an "explicitly race-based" reason for striking potential juror Hicks and that the district court therefore was required to uphold their *Batson* challenge. Hicks was a co-parishioner with and a member of the same Masonic

lodge as a potential witness for defendant Thomas, and he expressed his inclination to give more weight to the testimony of "a fellow Mason." Additionally, ten years before the defendants' trial Hicks was an alternate on a jury that acquitted an African-American defendant of the murders of seven Caucasian individuals. He had been present for the jury's deliberations. The government challenged Hicks for cause based on his relationship with the prospective witness, and after the district court denied the challenge, the government exercised a peremptory strike. When called upon to provide a race-neutral reason for striking Hicks, the government stated that it was exercising the challenge "based upon the previous arguments," that is, the relationship with the witness. It said Hicks' prior service on a jury was another reason. The prosecutor, familiar with the earlier case, described the acquittal as a "shocking" result in a "highly volatile murder case" that "involved racial issues." He noted that evidence had been presented at trial that the defendant committed the murders "because he didn't like white individuals."

The defendants argue that "there was no reason to describe in detail the racial aspects of the previous case" unless the prosecutor "thought those aspects relevant to his decision." We are not convinced. First, the government's primary motivation for excusing Hicks was his relationship with a witness—a drug abuse counselor who had treated defendant Thomas. His jury service was a secondary reason. We do not know why the prosecutor shared his knowledge of the prior case, but, unlike the defendants, we do not see his description as amounting to an explicitly race-based reason for the peremptory challenge. The government did not rely on the unfounded assumption of racial solidarity that *Batson* intends to mitigate. *See Batson*, 476 U.S. at 97-98 (explaining that assumption of partiality toward defendant based on

shared race is impermissible). Rather, the strike was based on a *specific* occurrence unique to Hicks that the government found troubling. Hicks had been present during the prior jury's deliberations, and there is nothing implausible about the government's concern that it could not know whether and how he was influenced by that experience. *See Jones*, 224 F.3d at 621 (explaining that "intuitive assumptions" are permissible basis for peremptory challenges so long as they are race-neutral). This is particularly true where the government was prevented—as a result of the defendants' successful objection—from obtaining more information from Hicks about the jury deliberations in the prior trial and his impressions about the process.

The defendants turn next to potential alternate juror Cole, whom the government stated it was challenging because she circled "B" on the questionnaire that probed her views on the death penalty. Choice "B" signifies: "I am strongly opposed to the death penalty, and I will have a difficult time voting to impose it." But the prosecutor did not stop there; he further represented that he was "absolutely certain" that the government had not accepted any jurors who had answered "C," and that the jury "might have had one 'D.'" Although at the time the defense did not fact-check the government's statement, it now asserts, and the government agrees, that the representation was inaccurate. In fact the government (at that point) had not allowed any juror who had answered "B" to be empaneled, but one juror who had answered "C" and four who had answered "D" had been seated. But, as we have said, the defendants did not scrutinize the government's representation at the time, and it admits that "the district judge was unaware of this misstatement." The burden was on the defendants to establish pretext, *see Purkett v. Elem*, 514 U.S. 765, 768 (1995), but they concede that they did not do so because

they were "lulled" by the government's expression of certainty. The government was correct in stating that theretofore it had rejected all jurors like Cole who had selected "B." We cannot fault the district court for not realizing spontaneously what we recognize in hindsight, that the government was mistaken about the jurors who answered "C" or "D."

Finally, the defendants raise a confusing argument that they were denied the opportunity to raise a *Batson* challenge with respect to one African-American potential juror because she was excused for cause on the government's motion. Potential juror Artis was dismissed after she explained that she was against the death penalty and that she could not recommend a death sentence. The defendants' argument rests on pure speculation—they merely suspect that the government would have exercised a peremptory challenge against Artis had its challenge for cause been denied. Moreover, *Batson* prohibits the use of peremptory challenges in a discriminatory fashion; it does not require a district court to deny challenges for cause with respect to African-American potential jurors just to guarantee the defendants the *opportunity* to raise a *Batson* challenge. The defendants also fault the district court for supplying reasons for the dismissal for cause beyond those given by the government. But dismissals for cause are distinct from peremptory challenges in that the district court may exclude any juror who appears unable to render impartial service; no motion by counsel is even required. 28 U.S.C. § 1866(c)(2); *see Hughes v. United States*, 258 F.3d 453, 464 (6th Cir. 2001); *United States v. Torres*, 128 F.3d 38, 43 (2d. Cir. 1997). There is nothing improper about a district court articulating its own reasons for a dismissal for cause. The defendants do not argue that cause was lacking, and so we find no error with respect to Artis.

Having addressed the defendants' *Batson* arguments, we turn now to defendant Taylor's somewhat cursory argument that his rights under the Confrontation Clause were violated when Thomas's counsel, during closing argument, used Taylor's name when referencing a written statement from which the judge had ordered it redacted. The statement in question was given to police by Thomas. He told police that on the day of the murder, "Styles[4] and Bud" had borrowed his car (which was spotted at the crime scene) from Damione Thomas, who had the keys at the time. In order to avoid a Confrontation Clause problem, the district court redacted Taylor's name from the statement, which was admitted into evidence during the testimony of an ATF agent. *See Bruton v. United States*, 391 U.S. 123 (1968); *United States v. Souffrant*, 338 F.3d 809, 828-29 (7th. Cir. 2003). The jury heard only that Thomas told police that he lent his car to "Bud and another person." But during closing argument, Thomas's attorney mentioned Taylor, apparently accidentally. Counsel stated that Thomas told police that "Damione told them he gave the keys to another person and to Styles—I'm sorry, another person and Bud." The context suggests that counsel verbally redacted the wrong name. Taylor did not object. However, he later moved for a new trial in part on the basis of this incident, and he now contends that the attorney's comment violated his right to confront the witnesses against him.

Taylor's argument fails because the attorney's remark he challenges is not "testimonial evidence" covered by the Confrontation Clause. *See Crawford v. Washington*, 542 U.S. 36 (2004); *United States v. Ellis*, 460 F.3d 920, 923-24 (7th Cir. 2006). Taylor does not quarrel with the district court's ruling that Thomas's statement could

---

[4] Styles is Taylor's first name.

be admitted only in redacted form. Instead he is complaining about a comment made by Thomas's attorney during closing argument.[5] As every jury is instructed, lawyers' statements are not evidence. To the extent that Taylor has a valid complaint, it has to do with an improper remark or characterization of the evidence by Thomas's counsel that implicates the fairness of the joint trial. *See, e.g., Zafiro v. United States,* 506 U.S. 534, 538-39 (1993); *United States v. Carrillo,* 435 F.3d 767, 778-79 (7th Cir. 2006); *United States v. Mietus,* 237 F.3d 866, 874 (7th Cir. 2001). Taylor, however, raises no such argument. We certainly do not endorse what happened here, but it does not implicate the Confrontation Clause.

## III.

Defendant Taylor has not established a violation of the Confrontation Clause nor presented any alternate basis for challenging the remark of Thomas's attorney during closing argument. Additionally, we conclude that the district court did not clearly err in its handling of the defendants' objections with respect to the dismissals of potential jurors Golliday, Washington, Hicks, Artis, and Cole. The defendants have not demonstrated that the reasons given by the government for using peremptory challenges against these potential jurors were pretext for unlawful discrimination. However, we are unable to come to any conclusion with respect to potential juror Watson because the district court did not make a record of its credibility determination at the third stage of the *Batson* inquiry. Accordingly, we order a LIMITED REMAND

---

[5] This is true despite Taylor's mischaracterization of his argument in his brief as a challenge to "the admission of his non-testifying co-defendant's statement implicating him."

so that the district court has the opportunity to supplement the record with its reasons for denying the *Batson* challenge with respect to Heshla Watson. Because the scope of our remand is so narrow, we anticipate an expeditious response from the district court. In all other respects, we AFFIRM the judgment of the district court.

A true Copy:

      Teste:

 

                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*