In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 06-3574, 06-4038, 06-4067, 06-4171 & 07-2086

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DERRICK WHITE, MELVIN HERBERT, JAMES STEWART,
COREY EVANS, and MARVEL THOMPSON,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 464—**Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 26, 2008—DECIDED SEPTEMBER 29, 2009

No. 09-1285

MARVEL THOMPSON,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 1294—**Elaine E. Bucklo**, *Judge.*

SUBMITTED APRIL 28, 2009*—DECIDED SEPTEMBER 29, 2009

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* The five defendants in these consolidated appeals participated in a long-running conspiracy involving the distribution of vast amounts of cocaine, heroin, and marijuana by the Black Disciples street gang in Chicago. Derrick White was convicted following a jury trial, and on appeal he challenges various aspects of his trial. The other four defendants—Melvin Herbert, James Stewart, Corey Evans, and Marvel Thompson—pleaded guilty, and they each (with the exception of Evans, whose attorney has filed an *Anders* brief) challenge their sentences. We conclude that Stewart is entitled to a remand for resentencing in

---

* After examining the briefs and the record, we have concluded that oral argument in No. 09-1285 is unnecessary. That appeal—involving Thompson's challenge to the district court's order denying his motion under Rule 41(g) of the *Federal Rules of Criminal Procedure*—is consolidated with Thompson's merits appeal and submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2).

light of *Kimbrough v. United States*, 128 S. Ct. 558 (2007). As to the other defendants, we affirm.

We delayed issuing our decision in these appeals because while they were pending, Thompson filed a motion under Rule 41(g) of the *Federal Rules of Criminal Procedure* asking the district court to order the government to return more than $300,000 in property it seized when it raided Thompson's residence and business. The district judge denied the motion without prejudice, indicating that after Thompson's merits appeal was decided, she would "promptly decide" a renewed motion. Thompson appealed this order, claiming that the district court should not have denied his Rule 41(g) motion and asking us to order that it be reassigned to a new judge on remand. We dismiss this appeal for lack of jurisdiction because the district court's order was not final. To the extent Thompson seeks reassignment of his Rule 41(g) motion to another judge, we construe his appeal as a petition for mandamus and deny it.

## I. Background

The Black Disciples street gang operated a massive drug-trafficking organization in Chicago between 1989 and 2004. One of the largest gangs in the city, the Black Disciples financed most of their activities by selling enormous quantities of cocaine, heroin, and marijuana in housing projects and elsewhere on Chicago's South and West Sides. The Black Disciples prevented nongang members from selling drugs in areas the gang controlled unless those

outsiders paid "street taxes." Money obtained from drug sales and street taxes was laundered through real estate, jewelry, businesses, and vehicles obtained by gang members as part of the conspiracy. Most of the gang's drug-distribution activities occurred in the Englewood neighborhood on Chicago's South Side and public-housing projects on Chicago's South and West Sides.

The Black Disciples embraced a rigid hierarchical leadership structure. A "king" served as the leader of the Black Disciples and was responsible for developing gang policy and directing the gang's drug-trafficking operations. Marvel Thompson served as king of the Black Disciples from the early 1990s until 2003, at which point the gang shifted to a three-king leadership structure. "Board members" ranked just below the "kings" in the Black Disciples' hierarchy. The king assigned each board member to a specific geographic area, and board members oversaw the gang's narcotics operations in their areas of authority. Lower-ranking gang members paid board members street taxes in exchange for the right to sell drugs within the board member's area of control.

The Black Disciples protected their drug-trafficking activities by using younger gang members to provide security. The Black Disciples frequently posted gang members at housing projects that served as headquarters for the gang's drug-dealing activities. These gang members carried guns distributed by the gang and were assigned to protect the Black Disciples' activities from interference by the police or other rival gangs. The gang

also protected its drug operation by intimidating witnesses, shooting at police officers, and collecting debts through violent means.

As part of the gang's narcotics-trafficking operation, Black Disciples held frequent meetings to discuss the gang's drug-distribution network and fashion rules, and to decide how to provide security for important gang members and their drug activities. One gang rule called "Aid and Assistance" required all Black Disciples members to automatically and immediately assist any other member when asked for any purpose. Another rule called "Code of Silence" prohibited Black Disciples members from discussing gang business with nongang members. At the meetings gang members decided how to discipline members for violations of these and other rules. For example, if a gang member stole drugs or drug proceeds, cooperated with law enforcement, or failed to follow orders, he could be fined, beaten, shot, or killed.

On February 8, 2005, a grand jury sitting in the Northern District of Illinois returned a 49-count indictment against 46 defendants stemming from their involvement in the Black Disciples' drug-distribution network. Count 1, the centerpiece of the indictment, accused 45 of the defendants of conspiring to possess and distribute more than 50 grams of crack cocaine, more than 5 kilograms of powder cocaine, and more than 1 kilogram of heroin. Forty-five of the defendants pleaded guilty to various charges in the indictment; the forty-sixth defendant—Derrick White—was convicted after a jury trial of four offenses. Given the sprawling scope of this

case, the number of defendants, and the variety of issues each defendant raises on appeal, we save our description of each defendant's individual involvement with the Black Disciples' drug conspiracy for our analysis below.

## II.  Analysis

### A.  Marvel Thompson

Marvel Thompson was the king of the Black Disciples from the early 1990s until 2003, when the gang embraced a three-king leadership structure that left Thompson in charge of the gang's South Side operation. As a king Thompson directed the Black Disciples' vast drug-trafficking operations and controlled other gang members' activities. Thompson pleaded guilty to the conspiracy charge in the indictment. His presentence report ("PSR") placed him in Criminal History Category I, and his adjusted offense level was 46 under the sentencing guidelines (the sentencing table tops out at 43); this yielded an advisory guidelines sentence of life imprisonment. He was sentenced to 540 months in prison.

On appeal Thompson argues that the district court committed several errors in the application of guidelines enhancements and that his sentence is otherwise unreasonable.[1] He first argues that the district court erred

---

[1] Thompson also argues that the district court violated the Due Process Clause because it did not require the government

(continued...)

when it applied a four-level enhancement for being an "organizer or leader" of the conspiracy. U.S.S.G. § 3B1.1(a). The gist of Thompson's argument is that the government only established that he was a leader of the Black Disciples gang, not a leader of the drug conspiracy. To the contrary, the government presented substantial evidence that as king of the Black Disciples, Thompson coordinated the drug-distribution conspiracy. Thompson's sentencing hearing spanned two days, and nine different coconspirators testified that Thompson was the king of the Black Disciples and was extensively involved in directing the gang's narcotics operation. They testified that Thompson controlled the entire Black Disciples organization, provided drugs to gang members to sell, controlled more than 15 drug-selling locations, made thousands of dollars a day from drug sales, collected payments from street-level drug dealers, laundered drug money through real estate he owned, resolved disputes among gang members, and disciplined Black Disciples members who broke gang rules. The government also introduced evidence seized from Thompson's apartment, which included several handguns, gang literature, more than $300,000 in small bills, and letters from other Black Disciples members who acknowledged his leadership role and asked for money or assistance.

---

[1] (...continued)

to prove beyond a reasonable doubt the sentencing facts it relied on to increase his sentence. We have rejected this argument many times. *See, e.g.*, *United States v. Santiago*, 495 F.3d 820, 824 (7th Cir. 2007).

Against this mountain of evidence establishing his role as a leader of the Black Disciples' drug conspiracy, Thompson offers two additional arguments, both weak. First, he claims that because much of the evidence was drawn from grand-jury proceedings, the trial of coconspirator Derrick White, plea agreements, and plea colloquies, he did not have the opportunity to challenge it. But the government gave Thompson this evidence well in advance of his sentencing hearing, and he had ample opportunity to contest it during the two-day hearing. Second, Thompson argues that some of the evidence is unreliable. This argument amounts to little more than an invitation to second-guess the district court's factual findings, which are clearly supported by the evidence. The district judge presided over this 46-defendant case for nearly three years and demonstrated intimate familiarity with the substantial evidence that overwhelmingly identified Thompson as a leader of the drug conspiracy. We will "not second guess the determinations made by a judicial officer who has observed the testimony and made careful judgments about the witness' veracity." *United States v. Hollins*, 498 F.3d 622, 631 (7th Cir. 2007). The district court did not clearly err in applying the four-level "organizer or leader" enhancement under § 3B1.1(a).

Thompson next argues that the district court clearly erred in applying a two-level enhancement for possession of a dangerous weapon in connection with a drug-trafficking offense. U.S.S.G. § 2D1.1(b)(1). For purposes of the § 2D1.1(b)(1) enhancement, a defendant "is considered to have 'possessed' a firearm if coconspirators possessed firearms in furtherance of the conspiracy and [the defen-

dant] could have reasonably foreseen the coconspirators' possession." *United States v. Acosta*, 534 F.3d 574, 588 (7th Cir. 2008).

There is ample support for the district court's application of the dangerous-weapon enhancement. Law-enforcement officers recovered two loaded guns—along with more than $300,000 in $10 and $20 bills—when they searched Thompson's apartment. One of these guns had its serial number obliterated, which coconspirator Varney Voker explained was a common Black Disciples tactic to prevent the gang's weapons from being traced. Contrary to what Thompson suggests, the government need not always establish the presence of drugs at the same place where the firearm is found to support the dangerous-weapon enhancement; such a showing is a sufficient, but not a necessary, condition. *See, e.g.*, *United States v. Womack*, 496 F.3d 791, 798 (7th Cir. 2007).

Even without the guns recovered from his apartment, however, application of the enhancement was justified based on Thompson's leadership role in the Black Disciples. In this regard, Thompson's case is indistinguishable from *United States v. Souffront*, 338 F.3d 809 (7th Cir. 2003), a case in which we affirmed the application of the § 2D1.1(b)(1) enhancement to a drug kingpin when trial testimony revealed that members of the drug conspiracy carried guns and used them for disciplinary and security purposes. Similarly here, the government introduced substantial evidence that the Black Disciples' drug operation relied heavily on gun-carrying gang members to provide security and to discipline out-of-line gang

members. Additionally, the Black Disciples controlled the housing project where coconspirator Derrick White shot a police officer; White used a gang-provided firearm while providing security for the drug-trafficking organization Thompson directed. As if more were needed, the evidence also established that Thompson ordered one gang member killed whom he suspected of cooperating with law enforcement and another gang member shot for violating gang rules. The dangerous-weapon enhancement was properly applied.

Thompson also challenges the district court's application of a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. An obstruction-of-justice enhancement is proper if the defendant commits perjury—that is, if he willfully gives false testimony under oath about a material matter. *United States v. Price*, 516 F.3d 597, 607 (7th Cir. 2008). A defendant can obstruct justice by lying about relevant conduct that would enhance his sentence, *see United States v. Kroledge*, 201 F.3d 900, 905 (7th Cir. 2000), and that is precisely what the district court concluded occurred in this case. During his plea colloquy, Thompson refused to admit to the government's assertion that he was a king in the Black Disciples organization, saying, "As far as the kings and all that, that's, that's— I told them a thousand times, that's not me." The government then introduced substantial evidence establishing Thompson's role as a king, and the district court concluded Thompson "absolutely lied" about his role in the Black Disciples.

Thompson raises two challenges to the application of this enhancement: that his statement to the district

court during the plea colloquy was not a lie and that it was not material. Regarding the first of these claims, Thompson contends that his statement about his role in the Black Disciples was just his effort to explain to the court that he only led *part* of the gang's operations. He argues that he was only trying to correct the government's erroneous assertion that he was responsible for the coconspirators' activities even though he did not control their geographic area. To the contrary, however, Thompson's statement denying his status as king was in response to a lengthy description by the government of his ascension through the Black Disciples' ranks and its explanation of the Black Disciples' leadership structure. The statement was in the form of a flat denial—"it's not me." The record also reflects that Thompson repeatedly minimized his role with the Black Disciples. We find no fault with the district court's finding that Thompson lied.

Nor are we convinced that Thompson's lie was immaterial. Numerous courts have held that when a defendant lies during a plea hearing by attempting to minimize his role in an offense, that lie is material for purposes of § 3C1.1. *See, e.g.*, *United States v. Sanders*, 162 F.3d 396, 402-03 (6th Cir. 1998); *United States v. Hernandez Coplin*, 24 F.3d 312, 317-18 (1st Cir. 1994). And we have specifically held that an obstruction-of-justice enhancement is warranted when the defendant minimizes his role in a conspiracy during a sentencing hearing. *See United States v. Sharp*, 436 F.3d 730, 738 (7th Cir. 2006). Sentencing courts must consider a defendant's role in a conspiracy when determining whether a § 3B1.1 enhancement or a § 3B1.2 reduction is applicable. Thompson's attempt to

mislead the district court about his role within the Black Disciples "[made] it more difficult for the court to give him the sentence that is his just [dessert]." *United States v. Sapoznik*, 161 F.3d 1117, 1121 (7th Cir. 1998). Accordingly, the district court did not clearly err in applying the obstruction-of-justice enhancement.

Thompson next claims he is entitled to a reduction under U.S.S.G. § 3E1.1(a) for acceptance of responsibility. When a defendant's offense level is properly enhanced for obstruction of justice under § 3C1.1, he is generally not entitled to a reduction for acceptance of responsibility absent "exceptional circumstances." *United States v. Davis*, 442 F.3d 1003, 1009-10 (7th Cir. 2006). We have previously affirmed the denial of a § 3E1.1(a) reduction where the defendant minimizes his role in the offense. *United States v. Linnear*, 40 F.3d 215, 222 (7th Cir. 1994).

The district court properly withheld the acceptance-of-responsibility reduction. Thompson lied about his role as king of the Black Disciples and disputed the degree to which he engineered the gang's drug-trafficking operations. Furthermore, although the evidence overwhelming revealed that he directed a massive drug organization for approximately 15 years, the only drug transactions Thompson actually admitted were a 2004 purchase of 150 grams of heroin and a 2004 sale of 1 kilogram of heroin and 28 kilograms of cocaine. Even more incredulously, Thompson initially testified that he had no idea what his coconspirators were going to do with the drugs he sold them on those occasions and revised his statement only after the district court expressed understandable skepticism.

Skeletal admissions and minimization generally undermine a defendant's argument for a § 3E1.1(a) acceptance-of-responsibility reduction; when combined with the obstructive conduct that led to the application of a § 3C1.1 enhancement for obstruction of justice, Thompson's argument for an acceptance-of-responsibility enhancement evaporates. To the extent Thompson contends that the government agreed to a § 3E1.1(a) reduction, he severely distorts the record. Although the government said it would recommend an acceptance-of-responsibility reduction if Thompson pleaded guilty by a certain date (and he did), prosecutors were not bound by this agreement after Thompson lied about his role in the Black Disciples' drug conspiracy at his change-of-plea and sentencing hearings. Accordingly, the district court properly denied Thompson a § 3E1.1(a) reduction for acceptance of responsibility.

Finally, Thompson challenges his 540-month sentence as unreasonable. He argues that the district court gave too little weight to his lack of a criminal record, his personal characteristics, and his family responsibilities. Thompson also believes that the district court did not adequately explain why it imposed a 45-year sentence on a 37-year-old with no criminal history. When a defendant presents "stock arguments that sentencing courts see routinely," we have said that "a sentencing court is certainly free to reject [them] without discussion." *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008). Moreover, "arguments clearly without merit can, and for the sake of judicial economy should, be passed over in silence." *United States v. Cunningham*, 429 F.3d 673, 678 (7th Cir. 2005).

Here, the district court considered, among other things: (1) the nature and circumstances of the offense, which the court said "could hardly be worse" because it was "a crime against the south side" and "the kind of crime that keeps people from having a chance"; (2) Thompson's role as kingpin of the Black Disciples organization; (3) certain positive aspects of Thompson's character as shown by his leadership qualities, his occasional good deeds, and the fact that his children loved him; (4) the cynical message Thompson sent to children by appearing as a leader of a gang; (5) the need to deter others from selling drugs and joining street gangs; and (6) the likelihood that Thompson would return to selling drugs upon his release from prison. After commenting on these factors, the court rejected the recommended life sentence, concluding that there was at least a *possibility* of rehabilitation. In short, after an exhaustive two-day sentencing hearing, the district court thoughtfully considered Thompson's individual circumstances before imposing a below-guidelines sentence of 540 months. This was not an abuse of discretion.

## B.  Melvin Herbert

Melvin Herbert pleaded guilty to the conspiracy count charged in the indictment, admitting that he held a leadership position in the Black Disciples' drug-trafficking operation. The district court found that the total amount of drugs involved in the conspiracy included more than 1.5 kilograms of crack cocaine, 30 kilograms of heroin, and 150 kilograms of powder cocaine. Herbert received

guidelines enhancements for possessing a weapon in connection with a drug-trafficking offense and for being a manager or supervisor of criminal activity, and a guidelines reduction for acceptance of responsibility. This brought his advisory guidelines range to 360 months to life imprisonment. The district court imposed a below-guidelines sentence of 310 months.

The sole issue Herbert raises on appeal is whether he is entitled to a remand for resentencing under either *Kimbrough v. United States*, 128 S. Ct. 558, or 18 U.S.C. § 3582(c). Because Herbert did not object to the crack/powder disparity before the district court, we review these forfeited issues for plain error. *See United States v. Taylor*, 520 F.3d 746, 747-48 (7th Cir. 2008).

In *Kimbrough* the Supreme Court held that district courts may consider the disparity between the guidelines' treatment of crack cocaine and powder cocaine when fashioning a defendant's sentence. In *United States v. Taylor*, 520 F.3d 746, we adopted a limited-remand procedure for forfeited *Kimbrough*-type arguments to permit the district court to advise us of its inclination to impose a different sentence in light of *Kimbrough*. *Taylor* remands are premised on the notion that we cannot determine from the record whether the district court would have sentenced a defendant differently had it been aware of its discretion to consider the guidelines' disparate treatment of crack and powder cocaine. If the district court tells us it would impose a different sentence, then a *Kimbrough* error occurred; if the sentence would remain the same, then no *Kimbrough* error occurred and a remand for resentencing is not necessary.

Here, unlike in *Taylor*, we need not ask for the district court's view because even if the district court had *ignored* the crack cocaine attributable to Herbert, his guidelines range would remain unchanged. Based on the amount of powder cocaine and heroin involved in this conspiracy, Herbert's base offense level would be the same. At the time of Herbert's sentencing, the 1.5 kilograms of crack cocaine, 30 kilograms of heroin, and 150 kilograms of powder cocaine attributed to him each resulted in a base offense level of 38. If the district court focused exclusively on the powder cocaine and heroin it attributed to Herbert, it would still start with a base offense level of 38. Accordingly, any *Kimbrough* error that occurred in this case was harmless.

Nor do the retroactive amendments to the crack-cocaine guidelines require a remand in Herbert's case. Under 18 U.S.C. § 3582(c)(2), a defendant who "has been sentenced to a term of imprisonment based on a sentencing range that has been subsequently lowered" by the Sentencing Commission may move the district court for a reduction in his sentence based on the lowered range. A § 3582(c)(2) motion is addressed to the district court in the first instance, not to the court of appeals. In any event, as we have noted, the powder cocaine and heroin attributable to Herbert independently support a base offense level of 38. After applying the appropriate enhancements and reductions, Herbert's guidelines range remains 360 months to life imprisonment.

### C.  James Stewart

James Stewart pleaded guilty to the conspiracy count charged in the indictment and was sentenced to 292 months' imprisonment. Stewart admitted he sold drugs and worked security for the Black Disciples' narcotics operation. On appeal Stewart challenges the crack-cocaine sentencing ratio the Supreme Court declared advisory in *Kimbrough*. Unlike Herbert, Stewart preserved this argument in the district court, so our review is plenary, for abuse of discretion. *See United States v. Clanton*, 538 F.3d 652, 659 (7th Cir. 2008). We have said that a district court abuses its discretion under *Kimbrough* when it treats the crack/powder disparity as mandatory. *Id.* The district court did so here.

Because a *Kimbrough* error occurred, the government must show that the error was harmless. The government concedes it cannot meet this burden, and we agree. Stewart's PSR attributed 1.5 kilograms of crack cocaine to him. However, neither the plea agreement, the PSR, nor the district court calculated the specific quantity of powder cocaine or heroin attributable to him. Unlike in Herbert's case, we therefore cannot determine whether Stewart's advisory guidelines range would remain the same even if the district court ignored the amount of crack cocaine for which it found him responsible. Accordingly, we vacate Stewart's sentence and remand to the district court for resentencing in light of *Kimbrough*.

**D.  Derrick White**

Derrick White was the only defendant charged in the indictment who exercised his right to a jury trial. He was convicted of four counts: (1) the conspiracy charge; (2) shooting and attempting to murder a Chicago police officer for the purpose of maintaining and increasing his position in an enterprise engaged in racketeering activity; (3) carrying and using a gun during a violent crime; and (4) possession of a firearm by a felon. The district court sentenced White to 372 months' imprisonment, and he does not challenge his sentence.

White served as a soldier in the Black Disciples' narcotics enterprise, in which capacity he acted as a lookout at the gang's drug-dealing locations to warn about possible interference by the police or rival gang members. In 2001 White was working security at one of the high-rise housing projects the Black Disciples used as a drug-distribution site. On the night of May 8, 2001, undercover officers from the Chicago Police Department approached the building where White was stationed to conduct a "reverse sting," meaning they would arrest drug dealers when they arrived, then pose as the dealers and arrest anyone who tried to purchase narcotics from them.

Dressed as a construction worker, Officer Deon Hughes drove a U-Haul truck toward the building and got out of the vehicle. As he did so, White approached, frisked him, felt Hughes's bulletproof vest, and yelled, "5-0" (gang code for the police). Hughes then identified himself as a police officer, and White reached into his waistband for a gun. Hughes punched White in the face and tried to

run to the front of the U-Haul for cover, but White got off three shots. Two of the bullets hit Hughes, one in his lower back and one in his spine. Had Hughes not worn a bulletproof vest, the shot to his spine would have killed him. White fled the scene, but based on a description Hughes provided other officers as he lay injured, police later apprehended him.

White first argues that prosecutors impermissibly used a peremptory challenge to strike an African-American juror on the basis of her race contrary to *Batson v. Kentucky*, 476 U.S. 79 (1986). During jury selection, the district court informed potential jurors that the trial might last a week and a half and asked whether this schedule posed problems for any of them. Two women raised their hands and said they had child-care difficulties. Marcy DeVries, a white woman, said she had three children and she might have trouble finding someone to care for her children for an extended period of time. Vicki Jackson, an African-American woman, said she had nine children and that two were "sickly" so she needed to be available in case they had to go to the doctor. Jackson acknowledged, however, that her mother could take care of her children if necessary. When the district court entertained challenges for cause, White's attorney asked that DeVries be struck for cause because of her child-care problem. Noting that both Jackson and DeVries had child-care issues, the prosecutor responded that they should either both be retained or both be dismissed for cause.

The district court ultimately concluded that Jackson and DeVries should not be dismissed for cause. The

resulting jury pool at this stage included five African-Americans. Exercising peremptory challenges, prosecutors struck five whites (including DeVries) and three African-Americans (including Jackson).[2] The resulting jury included one African-American as a regular juror (Juanita Bradley) and one African-American as an alternate juror (Tammi Sherina Pierre-Pierre).

White's counsel then raised a *Batson* challenge to the government's use of a peremptory challenge against Jackson. The prosecutor responded that he struck both DeVries and Jackson because of child-care concerns. The government also proposed that the court promote alternative juror Pierre-Pierre to the regular jury so that there would be two African-Americans on the jury rather than one. White agreed to this suggestion. In light of the government's willingness to substitute an African-American alternate for a white juror, the district court concluded no *Batson* violation occurred. Following trial, the district court briefly revisited the *Batson* issue and reaffirmed its early decision.

On appeal, the government initially argues that White waived his *Batson* challenge. Because White's attorney agreed to the suggestion that alternate juror Pierre-Pierre be promoted to the regular jury, the government argues that White's attorney made a strategic waiver of White's *Batson* challenge. *See United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005) ("There may be sound

---

[2] The government's dismissal of the other two African-Americans is not at issue in this case.

strategic reasons why a criminal defendant will elect to pursue one . . . argument while also choosing to forego another, and when the defendant selects as a matter of strategy, he also waives those arguments he decided not to present."); *see also United States v. Wesley*, 422 F.3d 509, 520-21 (7th Cir. 2005) (finding waiver occurred when a defense attorney agreed with the judge's proposed remedy to correct an allegation of juror bias).

We disagree. Both before and after the seating of the alternate juror, White's attorney said that he objected to the dismissal of Jackson. Although White's attorney agreed to the government's proposal regarding the alternate, there is no indication this was a knowing and intentional decision to set aside White's *Batson* challenge. We have said that "[w]aiver principles should be construed liberally in favor of the defendant." *Jaimes-Jaimes*, 406 F.3d at 848. White's acceptance of the government's proposal to substitute the African-American alternate for a white juror did not amount to a waiver of his *Batson* challenge.

Though not waived, the *Batson* challenge was properly rejected. Under *Batson* when the government offers a race-neutral reason for dismissing a juror, the defendant must establish that proffered reasons are pretext for a discriminatory strike. *See United States v. Hendrix*, 509 F.3d 362, 370 (7th Cir. 2007). Although the defendant is usually required to establish a prima facie case that the government excluded a juror because of her race, when the district court rules on whether the government's race-neutral justification was pretextual,

as it did here, we treat the prima facie requirement as moot. *See United States v. White*, 416 F.3d 634, 640 (7th Cir. 2005). We review the district court's findings for clear error. *United States v. Taylor*, 509 F.3d 839, 843 (7th Cir. 2007).

We first note that prosecutors advanced a race-neutral reason for dismissing Jackson: her child-care concerns. Race-neutral reasons can include a concern that certain jurors "would not be able to give their full attention to a week-long trial." *United States v. Williams*, 934 F.2d 847, 849 (7th Cir. 1991). A juror who worries that her children are not adequately being cared for may not be able to give her full attention to a trial that lasts for more than a few days. This is a plausible race-neutral concern even if the juror can arrange for others to take care of her children; here, Jackson raised an issue about the unique medical needs of two of her children.

Because the government advanced a race-neutral justification, *Batson*'s burden-shifting approach proceeds to the determination of whether the asserted race-neutral reason was simply pretext for an impermissible racial motive. During a *Batson* pretext inquiry, the court looks to "whether a strike was racially motivated" and examines the "*honesty*—not the accuracy—of a proffered race-neutral explanation." *Lamon v. Boatwright*, 467 F.3d 1097, 1101 (7th Cir. 2006); *see also United States v. George*, 363 F.3d 666, 674 (7th Cir. 2004) (explaining that under *Batson*, "the government's proffered reason for the strike need not be particularly persuasive, or even based on quantifiable data, so long as it is not pretextual").

White argues that the government's decision to defend its use of a peremptory strike against Jackson on the same grounds—child-care concerns—that it opposed her for-cause dismissal suggests that the government acted with an impermissible racial motive. But the government opposed the for-cause dismissal of *both* DeVries *and* Jackson on these grounds, arguing that they should either both remain in the jury pool *or* both be removed. The court kept them both in the pool, and prosecutors then used two peremptory challenges to remove them both. At all stages of the jury-selection process, then, the prosecution treated Jackson and DeVries equally based on their expressed concerns about their child-care obligations. This is the converse of the situation the Supreme Court found problematic in *Miller-El v. Dretke*, where "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve." 545 U.S. 231, 241 (2005). Prosecutors here struck both jurors who raised child-care issues—one white and one African-American—based on a concern that their attention might be diverted from their responsibilities as jurors.

Other factors confirm the prosecutors' nondiscriminatory intent. We have previously noted that prosecutors likely harbor no discriminatory intent when minority jurors are empaneled even though prosecutors still had peremptory challenges remaining. *See United States v. Nichols*, 937 F.2d 1257, 1264 (7th Cir. 1991). Although the prosecutors used all of their peremptory challenges here, the resulting jury had one African-American, and the government proposed substituting an African-American

alternate for a white juror to increase the presence of minorities on the jury. Under these circumstances, the district court did not clearly err in rejecting White's claim of pretext under *Batson*. *See also United States v. Griffin*, 194 F.3d 808, 826 (7th Cir. 1999) (declaring that when the government advances a race-neutral justification, "we have 'no basis for reversal on appeal unless the reason given is completely outlandish or there is other evidence which demonstrated its falsity' " (quoting *Morse v. Hanks*, 172 F.3d 983, 985 (7th Cir. 1999))).

White next challenges the sufficiency of the evidence that he was a member of the Black Disciples' drug conspiracy or knowingly committed any acts in furtherance of the conspiracy. On a sufficiency-of-the-evidence challenge, we view the evidence in the light most favorable to the prosecution and will not reverse a conviction unless " '[no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Carrillo*, 435 F.3d 767, 775 (7th Cir. 2006) (quoting *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) (alteration in original)). White does not challenge the evidence that he shot Officer Hughes; rather, he claims that the evidence was insufficient to connect him to the drug-trafficking conspiracy.

To the contrary, the evidence of White's knowing participation in the conspiracy—and the connection between the conspiracy and the shooting—was overwhelming. White admitted in his postarrest statements to police that he was providing security for the Black Disciples' drug activities on the night of the shooting.

He told Officer Sheppard, who arrested him, that he was "security," which Sheppard testified generally meant that White was protecting the gang's drug-trafficking operations. In addition, after White was *Mirandized*, he told police he was "working security for the Black Disciple dope operation that evening" but that he didn't know the "names of the people that were out there dealing drugs, any of the Black Disciples." A coconspirator need not know everyone involved in a conspiracy to be a member of it. *United States v. Duran*, 407 F.3d 828, 835-36 (7th Cir. 2005). That White disclaimed knowledge of the names of the coconspirators at the scene on the night of the shooting is irrelevant. His own statements undermine his sufficiency-of-the-evidence argument.

And there was much more than White's own statements. Two police officers and one Black Disciples member testified that the housing project where White shot Officer Hughes was known to be controlled by Black Disciples gang members, who distributed drugs there under cover of "security" provided by the gang. Officer Hughes testified that White frisked him when he got out of the U-Haul, shouted "5-0" (meaning "police") after discovering his bulletproof vest, and fired on him when Hughes announced himself as a police officer. Other witnesses testified that White's behavior in this regard was consistent with the security practices of a Black Disciples gang member. Finally, there was evidence that the guns used by Black Disciples members working "security" for the gang's drug-distribution network were provided by the gang and often had

their serial numbers obliterated; White used such a firearm to shoot Hughes. This evidence amply supports the jury's verdict on the conspiracy count.

White also challenges the sufficiency of the evidence on his racketeering conviction. Specifically, White claims the government failed to prove the Black Disciples were engaged in interstate commerce or that the gang's activities affected interstate commerce. We have said that to prove the interstate-commerce element of a racketeering offense, the government need only show "[a] minor or minimal influence on interstate commerce," such as a drug-dealing organization obtaining drugs from outside the state. *United States v. Farmer*, 924 F.2d 647, 651 (7th Cir. 1991). Here, the government called a Drug Enforcement Administration ("DEA") agent to testify that all illegal cocaine and heroin, and the drugs seized from street-level drug dealers operating in areas controlled by the Black Disciples, is produced outside Illinois and imported into the state. That testimony is sufficient to establish the requisite link to interstate commerce needed to sustain White's racketeering conviction; the DEA agent need not specify that the drugs seized in this case traveled in interstate commerce.

White's final sufficiency-of-the-evidence challenge relates to his conviction for possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Like his challenge to his racketeering conviction, White claims that the government failed to prove that the weapon he used to shoot Officer Hughes traveled in or affected interstate commerce. At trial an Alcohol, Tobacco,

and Firearms ("ATF") agent testified that the Lorcin semiautomatic pistol White possessed and used to shoot Officer Hughes was probably manufactured in either Nevada or California. However, because the firearm's serial number was unreadable, the agent could not determine exactly where it was manufactured or when it entered Illinois.

White tries to compare his case to *United States v. Groves*, 470 F.3d 311 (7th Cir. 2006), but the comparison is inapt. In *Groves* an ATF agent testified that in Indiana there were no "major manufacturers" of shotguns—the type of weapon the defendant in that case possessed. *Id.* at 324. We reversed the conviction, holding that the agent's testimony was "too vague to support proof of this element beyond a reasonable doubt" because it was not clear what the agent meant by "major" shotgun manufacturers and he was never asked about the likelihood that the gun was made in Indiana. *Id.* at 324-28.

This case is far different; the ATF agent's testimony here was much more specific than the agent's testimony in *Groves*. The agent testified that the markings on the pistol were consistent with the firearm having been manufactured in California or Nevada. We have never required prosecutors to prove the precise state of origin to prove the interstate-commerce element of a § 922(g)(1) charge. The dispositive inquiry is whether the gun crossed state lines at some point. Although the markings on the pistol White used to shoot Hughes do not conclusively establish the state where the pistol was manufactured, they do establish that the pistol

was manufactured outside of Illinois. Accordingly, the evidence is sufficient to support the jury's verdict on the felon-in-possession count.

Finally, White raises two evidentiary errors that he claims warrant reversal. The first relates to testimony given by Robert Berk, a trace-evidence expert the government called to testify about gunshot-residue evidence. Because White had particles consistent with gunshot residue on his hands, the government called Berk to testify that White could only have acquired the trace elements associated with gunshot residue by firing a weapon. During his direct examination, Berk briefly referred to a "hand blank" study supporting this conclusion. Later, after cross-examination revealed that the particles associated with gunshot residue could come from environmental conditions or some fields of employment, Berk testified on redirect that it was unlikely that the gunshot-residue particles on White's hands came from these sources.

White argues that this testimony violated Rule 16(a)(1)(G) of the *Federal Rules of Criminal Procedure*, which requires pretrial disclosure of an expert witness's "opinions, the bases and reasons for those opinions, and the witness's qualifications." However, White is required to establish that any Rule 16 violation hampered his opportunity to prepare a defense or that the violation substantially influenced the jury. *See United States v. Stevens*, 380 F.3d 1021, 1026 (7th Cir. 2004). He can do neither. He had an opportunity to examine Berk outside of the presence of the jury for more than an hour

before trial. His counsel vigorously cross-examined the government's expert, and the testimony he objects to was offered in rebuttal, as a part of Berk's redirect testimony. Moreover, White had his own expert available on this subject whom he chose not to call. White also makes a conclusory argument that Berk's reference to an FBI-authored study in the *Journal of Forensic Science* violated Rules 702 and 703 of the *Federal Rules of Evidence* because the studies were unreliable. There is no support for this assertion. Accordingly, we reject White's claims of evidentiary error.

White next complains that the district court erroneously refused the jury's request for a transcript of the trial testimony of Officer Hughes, a decision we review for abuse of discretion. *United States v. Guy*, 924 F.2d 702, 708 (7th Cir. 1991). There was no abuse of discretion here. The district court had previously rejected a jury request to see the handwritten statement of another witness that helped establish White's connection to the Black Disciples. Later during deliberations the jury asked for a transcript of Officer Hughes's testimony. Again the judge declined the jury's request and instructed jurors to rely on their collective memory of the evidence. This approach to jury questions of this sort is well within the trial court's discretion. *Id.*

Finally, White claims he is entitled to a new trial based on cumulative error. *See United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001). That doctrine has no application here; we have identified no trial-court errors. *Id.* ("If there are no errors or a single error, there can be no cumulative error.").

**E. Corey Evans**

Corey Evans pleaded guilty to the conspiracy count and to one count of using a communications facility to distribute narcotics. He admitted he served as a board member in the Black Disciples' narcotics operation, in which capacity he sold drugs and oversaw the gang's drug-selling operation. The district court imposed a sentence of 325 months. His attorney filed an *Anders* brief, and Evans filed a response. Our review is confined to the issues presented in those briefs.

The only potential nonfrivolous basis for appeal was raised in a separate letter submitted by Evans's attorney. In it she notes that the Supreme Court decided *Kimbrough* after she filed her *Anders* brief and therefore Evans may argue he is entitled to a remand for resentencing. Although Evans preserved this argument in the district court, Evans's circumstances are identical to Herbert's. The district court found Evans responsible for more than 1.5 kilograms of crack cocaine and 30 kilograms of heroin, which supported a guidelines range of 360 months to life. Even if the district court ignored the crack cocaine it attributed to him, the amount of heroin for which the court held Evans responsible results in the same base offense level of 38. After applying the appropriate weapon and leadership enhancements and the acceptance-of-responsibility reduction, Evans's advisory guidelines range remains 360 months to life. As such, any *Kimbrough* argument would be frivolous.

We have reviewed the other arguments Evans and his attorney advance and conclude there are no nonfrivolous issues for appeal. The government was not required to prove sentencing facts beyond a reasonable doubt; the district court properly calculated the quantity of drugs attributable to Evans and made appropriate credibility determinations; and the court properly applied a dangerous-weapon enhancement to Evans's offense level. Also, Evans's argument that the district court improperly applied a four-level enhancement for serving as a leader of the conspiracy is frivolous; the argument was not raised in the district court, and on plain-error review Evans cannot prevail because the government introduced substantial evidence describing the supervisory power Evans wielded in the conspiracy. Finally, the district court imposed a reasonable sentence after giving due consideration to the § 3553(a) factors. Accordingly, we grant Evans's counsel's motion to withdraw.

## F. Thompson's Rule 41(g) Motion

When Thompson was arrested in May 2004, the government seized cash and personal property from Thompson's residence and business. The seized property included computer equipment, financial documents, electronic equipment, a 2001 Ford Excursion (which is no longer in the government's possession), and approximately $320,000 in cash. Although the indictment included a count seeking forfeiture of this property as proceeds of Thompson's drug-trafficking activities, to

our knowledge the government has not pursued forfei-
ture. Furthermore, apparently because of an oversight, no
reference to the seized property was included in the PSR;
it was not considered when the district court calculated
Thompson's guidelines range and imposed his sentence.

While this appeal was pending, Thompson filed a pro se
motion under Rule 41(g) of the *Federal Rules of Criminal
Procedure* seeking the return of the property.[3] Rule 41(g)
provides:

> A person aggrieved . . . by the deprivation of prop-
> erty may move for the property's return. . . . The court
> must receive evidence on any factual issue necessary
> to decide the motion. If it grants the motion, the
> court must return the property to the movant, but
> may impose reasonable conditions to protect access
> to the property and its use in later proceedings.

Thompson argued (among other things) that he wanted
the money returned in order to settle a pending tax
dispute with the IRS and to support his wife and his
19 children.

The district court held a status hearing on the motion
and noted that because Thompson's PSR did not include
the seized funds as assets potentially available to Thomp-

---

[3] The district court had jurisdiction to consider Thompson's
Rule 41(g) motion while his criminal appeal was pending
because a Rule 41(g) motion initiates a new civil equitable
proceeding. *United States v. Howell*, 354 F.3d 693, 695 (7th
Cir. 2004).

son, the true size of Thompson's assets was not fully known at sentencing. The court suggested that this information might have warranted a larger fine beyond the $100,000 it imposed when it sentenced Thompson. Because Thompson's appeal of his sentence was pending in this court and the district court lacked jurisdiction to revisit Thompson's sentence unless we vacated it, the court decided to hold Thompson's Rule 41(g) motion in abeyance until we resolved Thompson's appeal. Thompson objected, and the district court shifted course and simply denied the motion as premature, saying that if Thompson's sentence was affirmed, it would "promptly decide" a new Rule 41(g) motion.

Thompson appealed this order, challenging several aspects of the district court's handling of his motion. First, he argues that the district court should have entered a default judgment against the government. Second, he claims the district court erred by not deciding the merits of his Rule 41(g) motion. Third, he contends that the district court should not have held hearings on the Rule 41(g) motion outside of his presence. We conclude, however, that we lack jurisdiction to consider any of these arguments because the district court's order was not final under 28 U.S.C. § 1291. The district court made it clear that the denial of Thompson's Rule 41(g) motion was without prejudice and he was free to refile it; "[a] dismissal without prejudice is normally nonfinal because the plaintiff remains free to refile his case." *Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 526 F.3d 1093, 1097 (7th Cir. 2008). While "[i]n some instances . . . a dismissal without prejudice may effectively end the

litigation and thus constitute a final order for purposes of appellate review," *id.*, this is not one of those cases. The district judge indicated that the Rule 41(g) motion was premature and she wanted to wait until Thompson's merits appeal was resolved before addressing the substance of the motion. The judge said she would "promptly decide" a new motion after Thompson's merits appeal was decided. Accordingly, the court's order was nonfinal and we lack jurisdiction over Thompson's appeal.

Thompson also maintains, however, that the district judge should have recused herself based on an appearance of bias. It is somewhat unclear from the record whether Thompson ever made this request in the district court; Thompson's filings suggest that he raised the issue of bias and the court's decision briefly addressed the issue. In denying Thompson's Rule 41(g) motion as premature, the judge commented: "There is no basis for recusal and if [Thompson's] suggestion [of bias] is intended as a motion, it is denied."

A challenge to a district court's refusal to recuse may only be made by a petition for a writ of mandamus. *Tezak v. United States*, 256 F.3d 702, 717 n.16 (7th Cir. 2001). Although Thompson did not style his appeal as one seeking mandamus relief, we have previously said that an appeal of a denial of recusal should be construed as a petition for mandamus relief. *United States v. City of Chicago*, 870 F.2d 1256, 1259 (7th Cir. 1989). Therefore, we will treat Thompson's appeal as a petition for mandamus.

Under 28 U.S.C. § 455(b)(1), a judge must recuse herself when she "has a personal bias or prejudice concerning

a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." As the Supreme Court has explained, neither judicial rulings nor opinions formed by the judge as a result of current or prior proceedings constitute a basis for recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Furthermore, "expressions of impatience, dissatisfaction, annoyance, and even anger" do not justify requiring recusal. *Id.* at 555-56.

Thompson objects to some comments made by the district judge but none indicate bias. The district judge expressed some doubt that Thompson prepared his relatively sophisticated briefs himself and also remarked that his briefs were rude and impolite and "not very nice." These comments do not reflect impatience, dissatisfaction, annoyance, or anger. *Id.* Thompson also complains that the judge referred to him as a "kingpin," but this observation was entirely appropriate in light of the evidence introduced about Thompson's role in this conspiracy. *See United States v. Troxell*, 886 F.2d 830, 834 (7th Cir. 1989) (referring to defendant as "Madame Cocaine" and calling the defendant "not a nice person" did not support a finding of bias regarding subsequent proceedings). Thompson is not entitled to mandamus relief.

## III.  Conclusion

For the foregoing reasons, we VACATE James Stewart's sentence and REMAND to the district court for resen-

tencing in light of *Kimbrough*. We GRANT the motion to withdraw filed by Corey Evans's counsel and DISMISS Evans's appeal. We AFFIRM Derrick White's conviction. We AFFIRM Melvin Herbert's sentence. We AFFIRM Marvel Thompson's sentence. We DISMISS Thompson's appeal of the district court's order denying his Rule 41(g) motion for lack of jurisdiction. To the extent that appeal constitutes a petition for mandamus, it is DENIED.